STATE of Missouri, Respondent,

v.

Phillip E. SILVEY, Appellant.

Phillip E. SILVEY, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 74030, 76072.

Supreme Court of Missouri,
En Banc.

March 21, 1995.

Gary E. Brotherton, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for respondent.

THOMAS, Judge.

Phillip E. Silvey was found guilty by a jury of two counts of sodomy in violation of section 566.060, RSMo 1986. The victim was four years old when the offenses occurred. The trial court found Silvey to be a dangerous offender under section 558.016, RSMo Supp.1990, and sentenced Silvey to thirty years on each count of sodomy with the terms to run concurrently. The Court of Appeals, Western District, affirmed the conviction. Judge Ellis dissented and certified the cause for transfer to this Court because he deemed the majority opinion to be contrary to previous decisions of the appellate courts of this state. *Rule 83.01.* We disagree. Silvey's Rule 29.15 motion for post-conviction relief was overruled by the trial court, and his appeal of that decision has been consolidated with his appeal to this Court. *Rule 29.15(l).* Silvey raises eleven points on appeal. Affirmed.

## FACTS

Silvey's victim, A.P., was about four years old when the offenses occurred and was six years old at the time of trial. A.P. lived with her mother, S.S., in Cass County. Silvey moved in with S.S. and A.P. in November 1988 and moved out in September 1989. During this period of time, Silvey often baby-sat A.P. while S.S. worked.

A.P. testified that when she and Silvey were alone, Silvey would remove his clothes, remove her clothes, and touch her in her "front private" and her "back private" or butt with his hands, a butterfly knife, and a gun. A.P. testified that Silvey pinched her nose in order to get her to open her mouth,

and when she did he inserted his penis in her mouth. She testified that the penis squirted "slime" in her mouth.

A.P. testified that the acts of sodomy occurred both at night and during the day in the bathroom, living room, and in her mother's bedroom. She testified that she was scared when Silvey touched her with the butterfly knife because he told her not to tell anyone or he would kill her. A.P. described the knife and how Silvey opened the knife to expose the blade.

A.P. first reported Silvey's actions to her grandmother in July 1989. A.P. told her grandmother that Silvey had rubbed her lower back and upper buttocks. After hearing this, S.S. ordered Silvey out of the house. However, S.S. allowed Silvey back into the house two days later because she did not think Silvey had sexually abused her daughter. Silvey moved out permanently in September 1989.

A.P. finally told her mother about Silvey's abuse six months after Silvey had moved out. S.S. reported the abuse to the police and division of family services, and A.P. was taken to a hospital where a physical examination failed to reveal any significant findings of abuse.

S.S. testified that she noticed behavior changes in A.P. both during the time Silvey was in her house and after he had moved out. These changes included bed-wetting, loss of appetite, hyperactivity, nightmares, wetting and soiling her pants, and chewing her fingers until they were raw.

S.S.'s sister, V.S., also noticed appreciable changes in A.P.'s behavior when she cared for A.P. V.S. testified that A.P. was happy and excited to go home with Silvey when he first moved in, but later began to cry when it was time to leave with him and said that she did not want to see Silvey. V.S. also testified that A.P. began to wet the bed more than once a night and had nightmares. In the spring of 1990, A.P. began to cry when V.S. washed her buttocks. A.P. said it hurt and burned. On one occasion when V.S. saw A.P. and Silvey in a store, A.P. ran to V.S., clutched her leg and cried that she did not want to leave with Silvey.

Michael Boniello, a social worker trained to work with sexually abused victims, testified that S.S. brought A.P. to him for counseling. Boniello testified that A.P. had told him of the acts that Silvey committed on her. He stated that A.P. displayed several behavioral indicators consistent with children who have suffered sexual trauma similar to that reported by A.P.

K.M., A.P.'s grandmother and S.S.'s mother, testified that Silvey entered her place of business in April 1990 and asked to speak with her privately. Silvey told K.M. that he thought S.S. was saying that he was a child molester and that K.M. should tell S.S. to shut up because he did not know what he would do if he saw her. Silvey also said, "we all want to grow old and gray don't we?"

At trial, the prosecution showed A.P. a butterfly knife the prosecution had purchased that was similar to the butterfly knife owned by Silvey. A.P. identified the knife as being like the one used by Silvey.

V.S., A.P.'s aunt and S.S.'s sister, testified that, after Silvey had moved out of her sister's house, Silvey showed his butterfly knife to her and her then-fiance outside of a video store. Silvey told V.S. that the knife was a butterfly knife and demonstrated how it opened. V.S. identified the butterfly knife bought by the prosecution as like the knife owned by Silvey.

V.S.'s fiance, D.S., was also present when Silvey demonstrated his butterfly knife outside of the video store. D.S. also testified that the knife shown by the prosecution was like the knife owned by Silvey.

## DISCUSSION

### I.

In Silvey's first point on appeal, he argues that the trial court abused its discretion in allowing the prosecution, over objection, to place and demonstrate in front of the jury a butterfly knife not used in the commission of the charged offenses and unrelated to Silvey.

As the reader will surely note, a butterfly knife is a unique weapon that nearly defies an accurate oral or written description of its design and how it is opened and closed.

When closed, the four-inch blade rests within slots in the knife's two handles, like a buck knife with a second handle that closes over the unsharpened side of the blade. The two handles that enclose the knife are fastened at the bottom with a clasp. There are two pins at the top of the knife that connect each handle to the base of the blade and allow the handles to be rotated around the blade. The knife is opened by unhooking the clasp, whipping one of the handles almost 360 degrees around the pin connecting the handle to the base of the blade (this exposes the blade), turning the other handle 180 degrees, flipping the first handle back near its original position, and then flipping that handle in the original motion re-exposing the blade. If done correctly and with sufficient speed, the clasp will fall into place locking the two handles together at the bottom with the blade exposed at the top of the knife. The knife is closed by reversing the process.

The issue of whether the State would be allowed to display the butterfly knife to the jury first arose in the motion in limine filed prior to trial by Silvey. In the motion, Silvey argued that "any legitimate evidentiary purpose that the state may have can easily be served by the verbal testimony of A.P. that she was threatened with the knife.... Exhibition to the jury of a weapon related to neither the charged offense or the defendant has been found to be reversible error." (Citations omitted.) The motion in limine was overruled by the trial court. The trial court carefully controlled the use of the weapon by requiring the prosecution to request a bench conference to declare its intention to use the knife before showing the knife to any of its witnesses or demonstrating it to the jury.

At trial, A.P. testified that Silvey threatened to hurt her with a butterfly knife. A.P. testified that the knife was brown and silver and "had a little switch on the bottom and you opened it, and then you swing it up and it [the blade] come out." At this time, the

prosecution asked for the required bench conference and stated its intention of showing the look-a-like butterfly knife to A.P. Defense counsel objected because "the weapon which is not connected with either the defendant or offense is highly prejudicial and has no probative value to demonstrate this weapon in front of the jury." The court expressed its concern that showing the knife to A.P. may be leading the witness. Defense counsel stated that he had no objection to the leading nature of the proposed foundation question, but reiterated his earlier objection based on the knife being "a weapon which is not connected with the defendant and will not be connected with the defendant." The trial court overruled the objection and allowed the prosecution to proceed. Defense counsel requested and was granted a continuing objection on the grounds he had stated.

After A.P. was shown the knife and identified it as being like the knife owned by Silvey, the prosecution demonstrated how the knife opened.[1] Silvey did not object to the demonstration; all of his objections were based upon the grounds that the probative value of a similar knife was outweighed by the prejudice which arises because the knife was not related to the defendant or the offense. This is the only objection relating to the knife that Silvey preserved for appeal.

The prosecution relied on three witnesses for foundation evidence for the knife. The knife was first shown to A.P.

Q. [A.P.], did the knife that Phil [Silvey] showed you look like this knife?

A. Yes.

Q. Yes?

A. Yes.

Q. And did it open like this? (Demonstrating.)

A. Yes.

\*　\*　\*　\*　\*　\*

1. Because the weapon was used solely for demonstrative purposes and was not the actual weapon used in commission of the crime, it was not required that the knife be admitted into evidence. See *State v. Douthit*, 846 S.W.2d 761, 763 (Mo.App.1993) (no requirement that prosecution offer or admit into evidence shotgun un-connected with the defendant used solely by the prosecution for demonstrative purposes); *State v. Huff*, 831 S.W.2d 752, 754 (Mo.App.1992) (no requirement that prosecution offer or admit into evidence three shotguns unconnected with the defendant used solely by the prosecution for demonstrative purposes).

Q. Tell the jury how the defendant opened the knife—the knife.

A. He did this little clip at the bottom and it went like—somehow like that. (Indicating.)

Q. And the blade came out?

A. Yes.

Q. Like this? (Demonstrating.)

A. Yes

Q. Where did he put the knife, [A.P.]?

A. In my front private and back private.

Later, the prosecution asked V.S., who testified that she had seen Silvey with a butterfly knife in the past, if the exhibit was similar to the knife owned by Silvey:

Q. What did the knife that Mr. Silvey show[ed] you look like?

A. It was a kind of knife that the handles closed to cover the blade.

Q. Was that like this knife?

A. Yes.

      *      *      *      *      *      *

Q. Did Mr. Silvey demonstrate to you how he could open that knife?

A. Yes, he did.

Q. Did he demonstrate he could open that knife quickly?

A. Yes, he did.

Q. Did Mr. Silvey tell you what kind of knife it was?

A. He said it was called a butterfly knife.

Later, the prosecution asked D.S., V.S.'s husband, about Silvey's knife:

Q. Describe the knife.

A. It had a blade of about five or six inches long, and it had a black handle and the handle came down over to cover the blade itself, and then when you opened the blade up it made the handle.

Q. And did the handle lock?

A. Yes.

Q. How did the knife open?

A. Just closed it down and it covered the blade, and you would open them up and lock them and it made a handle. (Demonstrating.)

Q. During the conversation [with Silvey] did you learn whose knife that was?

A. Yes.

Q. Whose knife it was?

A. Phil's [Silvey].

Q. Did he tell you that?

A. Yeah. He said, "See my knife?"

Q. Did Phil show you how the knife worked?

A. Yes.

Q. Did he open it?

A. Yes.

Q. If I show you a knife, could you tell me if the knife I show you is the same kind of knife that Phil [Silvey] showed you in Pleasant Hill in front of the video store?

A. Yes.

Q. Is this a similar knife?

A. Yes, it is.

Q. That's what the knife looked like?

A. Similar to that.

Q. Is that how the handles worked?

A. Yes, it was.

Q. Did he tell you what kind of knife it was?

A. He told me it was a butterfly knife.

&#9644; There is no absolute rule that demonstrative evidence of a weapon unconnected with the defendant or offense charged is inadmissible. In *State v. Nelson,* 484 S.W.2d 306, 307 (Mo.1972), this Court held that a ballpeen hammer similar to one used in the assault charged and unconnected with the defendant was admissible as a demonstrative exhibit because it aided jury in determining the intent with which the assault was made.

As a general rule, demonstrative evidence is admissible in evidence if it is relevant, even though oral descriptions of the object might be given, provided there is no specific policy or principle to the contrary, and models, casts and reproductions of relevant objects which are not available may be received, in the discretion of the court; this, of course, assumes that the reproduction, or model, fairly represents the conditions which it is offered to show. Appellant does not contend that

Exhibit 6 [the look-a-like ballpeen hammer] was not an exact duplicate of the hammer actually used. There was nothing inflammatory about the exhibit, there was no deception, and no one could have been misled by the use of Exhibit 6. A hammer was used in making the assault, and when that hammer was not available to the State, the demonstrative exhibit was relevant to one of the issues and was helpful to the jury in determining the intent with which the assault was made.

*Id.* at 307 (citations omitted). *See also State v. Douthit,* 846 S.W.2d 761, 763 (Mo.App. 1993) (use of shotgun not connected with either defendant or charged offense as demonstrative evidence proper because it had probative value in aiding jury in understanding function of shotgun part found in car with defendant); *State v. Huff,* 831 S.W.2d 752, 754 (Mo.App.1992) (no error in allowing expert to utilize three shotguns unconnected with defendant for purpose of showing difference between shotguns because relevant to circumstances of the shooting); *State v. Friend,* 822 S.W.2d 938, 944 (Mo.App.1991) (admission of revolver and holster not directly connected with defendant not error because of sufficient connection between the revolver and the charged offense); *State v. Bullington,* 684 S.W.2d 52, 56, 57 (Mo.App. 1984) (shotgun unconnected with defendant admissible as demonstrative exhibit because relevant to issue of kidnapping, which was an element of the first degree murder charge); and *State v. Woods,* 637 S.W.2d 113, 117 (Mo.App.1982) (admission of gun similar to one used in defendant's escape as demonstrative exhibit not error because relevant to material issues).

■ In the present case, the prosecution established, through the testimony of three witnesses, that the knife used at trial was similar to the knife owned by Silvey. And there was no likelihood of deception as the prosecution neither expressed nor implied that the knife shown at trial was the knife actually owned by Silvey. The defense had ample opportunity to highlight on cross examination that the exhibit was not Silvey's knife.

Further, the use of the knife as a demonstrative exhibit was probative of a material issue in the case. The appellant put the time frame of the victim's reporting of the abuse at issue by raising doubts about the victim's credibility because it took her six months to report the abuse. The prosecution rebutted this argument by showing to the jury the type of weapon used by Silvey when he threatened to kill the victim if she ever told anyone about the abuse. It was because of the unique and almost indescribable character of the weapon that the prosecution had to show the jury a similar butterfly knife to demonstrate to the jury the possible effect of Silvey's threats and explain the victim's six month delay in reporting the abuse.

Appellant relies principally on three cases to support his argument. Each is distinguishable.

In *State v. Wynne,* 353 Mo. 276, 182 S.W.2d 294 (1944), this Court reversed a conviction after the trial court admitted a pistol unconnected with the defendant for the purpose of demonstrating how far a pistol stuck out of an individual's pocket. This Court held that the demonstration might have had some probative force, but there was insufficient proof of similarity of circumstances to warrant the demonstration. There was no testimony that the individual carried a gun similar to the one used in the demonstration, no testimony regarding the size of the individual's pockets, and the demonstration could have been just as effective without the use of the pistol as with the use of the pistol. In addition, the issue of how far the gun stuck out of the pocket was a "collateral, if not immaterial, matter." *Id.* 182 S.W.2d at 300.

In *State v. Perry,* 689 S.W.2d 123, 124–25 (Mo.App.1985), the court of appeals reversed a conviction where the prosecutor introduced into evidence a shotgun unconnected to the defendant in a case where the crime had been perpetrated by a handgun. After a high speed chase, the police found the shotgun wrapped in a blanket in the back seat of a car in which the defendant was a passenger. The weapon admitted into evidence was clearly dissimilar to the one used in the

commission of the crime and irrelevant to any material issue in the case.

In *State v. Grant,* 810 S.W.2d 591, 592 (Mo.App.1991), the court of appeals reversed a conviction where the prosecutor asked a witness to hold a pistol unconnected to the defendant to the prosecutor's head in an attempt to demonstrate how the witness could see into the chamber of the gun and observe that it was loaded. There was no evidence that the pistol used in the demonstration was at all similar to the one used in the crime. In addition, it was not shown whether bullets would have been visible if the gun were actually loaded.

The knife used by the prosecution in this case was proved to be similar to the knife owned by Silvey and was relevant to a material issue in the case. The trial judge occupies a superior vantage point for balancing probative value and prejudicial effect of demonstrative evidence. *State v. Holmes,* 609 S.W.2d 132, 135 (Mo. banc 1980). Thus, the trial judge is necessarily vested with broad discretion in admitting or rejecting such evidence. *Id.* at 136. We find that the trial court did not abuse its discretion in allowing the prosecution to display the butterfly knife. Point denied.

## II.

Silvey next argues that the trial court erred in overruling his motion to find section 491.060, RSMo 1994, unconstitutional. Section 491.060 provides in part:

The following persons shall be incompetent to testify:

\* \* \* \* \* \*

2) A child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which he is examined, or of relating them truly; provided, however, that except as provided in subdivision (1) of this section, a child under the age of ten who is alleged to be a victim of an offense under chapter 565, 566 or 568, RSMo, shall be considered a competent witness and shall be allowed to testify without qualification in any judicial proceeding involving such alleged offense. The trier of fact shall be permitted to

determine the weight and credibility to be given to the testimony; ....

Because A.P. was alleged to be a victim of an offense under chapter 566, RSMo, she was considered a competent witness and was allowed to testify without qualification. Silvey argues that the statute violates his rights to due process and equal protection in that it treats him in a disparate fashion simply because he was charged under chapter 566, RSMo. However, this Court has consistently upheld the constitutionality of section 491.060. *See State v. Williams,* 729 S.W.2d 197 (Mo. banc 1987); *See also State v. Naucke,* 829 S.W.2d 445 (Mo. banc 1992), and *State v. Wright,* 751 S.W.2d 48 (Mo. banc 1988).

In *Williams, supra,* this Court specifically upheld the constitutionality of section 491.060 against due process and equal protection attacks and noted:

Section 491.060(2), by allowing the child victim to testify without any further qualification did not deprive appellant of a meaningful opportunity to defend against the abuse charges. The statute merely insured that the child could testify and did not affect appellant's right to raise and pursue whatever defenses he may have had. He had the opportunity to cross-examine the child as to issues related to her maturity and her ability to recollect and relate the events of which he was accused.

*Id.* at 201.

Silvey cites no contrary authority. Point denied.

## III.

◼ Next, Silvey argues that the trial court violated his rights to Due Process and Equal Protection by refusing to submit to the jury Silvey's non-MAI proposed jury instruction regarding the credibility of witnesses below the age of ten who testify without qualification. Silvey claims that the proposed instruction was necessary because the Supreme Court has failed to comply with section 477.012, RSMo Supp.1990, which required that the Supreme Court, by January 1, 1991, "develop a jury instruction to be

used in criminal trials wherein a child under the age of ten is a witness." However, this Court has complied with section 477.012 by deeming MAI–CR 3d 302.01 as the only instruction required or allowed to be given on the credibility of any witness. Notes on Use to MAI–CR 3d 302.01 provide:

3. Except as may be specifically provided for elsewhere in MAI–CR, no other or additional instruction may be given on the believability of witnesses, or the effect, weight, or value of their testimony. The provisions of Section 477.012, RSMo Supp. 1991, are complied with by the giving of this instruction. [Emphasis added.]

Because the jury was given an instruction properly patterned after MAI–CR 3d 302.01, the jury was given the only appropriate jury instruction regarding credibility of witnesses. Point denied.

### IV.

■ Next, Silvey argues that the trial court plainly erred in failing to declare a mistrial, sua sponte, when, during the prosecution's rebuttal in closing argument, the prosecutor argued that the defense had been telling the jury half a story all along and that the defense had twisted A.P. up in knots. Because Silvey failed to request a mistrial at trial and failed to raise this issue in his motion for new trial, Silvey requests plain error review.

We decline to afford Silvey plain error review with respect to the prosecutor's statements in closing argument. Plain error review "should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review." *State v. McMillin,* 783 S.W.2d 82, 98 (Mo. banc 1990) (quoting, *State v. Valentine,* 646 S.W.2d 729, 731 (Mo.1983)). Relief should rarely be granted on assertions of plain error as to closing argument because, "in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Clemmons,* 753 S.W.2d 901, 907–08 (Mo. banc 1988). Under the circumstances of the closing arguments in this case, we decline to grant plain error review. Point denied.

### V.

Next, Silvey argues that the trial court erred and abused its discretion in sustaining the prosecution's objection to Silvey's attempt to question A.P.'s mother, S.S., about her prior drug use. Silvey argued that the prior drug use was relevant to show that S.S. was not paying much attention to A.P. during the period that S.S. noticed the behavioral problems in A.P. The prosecuting attorney argued that if it was relevant to S.S.'s ability to perceive the changes in A.P.'s behavior, then Silvey's drug use during the same period would also be relevant if he were to testify. After considering what would be opened up by allowing the question regarding S.S.'s previous drug use, the court held that the prejudicial effect as to everybody outweighed the probative value as to credibility.

■ The trial court is allowed broad discretion in deciding the permissible scope of cross-examination. *State v. Isa,* 850 S.W.2d 876, 896 (Mo. banc 1993). We review for abuse of discretion. *Id.* The prior drug use had limited probative value in this case as Silvey still had the opportunity to cross-examine S.S. concerning the accuracy of her observations of A.P.'s behavior and had the full opportunity to explore possible inconsistencies with S.S.'s sister's testimony regarding A.P.'s behavioral changes. To the contrary, the danger of prejudice was high as the admission could have opened the drug use door wide enough to bring Silvey's drug use into issue. The trial court did not abuse its discretion in sustaining the prosecution's objection to the question regarding S.S.'s prior drug use. Point denied.

### VI.

■ Next, Silvey argues that the trial court erred in failing to declare a mistrial, sua sponte, following the testimony of clinical social worker Michael Boniello. Boniello testified that A.P. displayed behavioral indicators consistent with child sexual abuse. Silvey argues that this testimony amounted to substantive evidence of his guilt and, thus, improperly bolstered the alleged victim's tes-

timony and invaded the province of the jury. Again, Silvey requests plain error review because he failed to object and, therefore, did not preserve this issue for appeal. Relief will not be granted under the plain error rule unless Silvey shows that the error affected his rights so substantially that a miscarriage of justice or manifest injustice would occur if the error is left uncorrected. *State v. Parker,* 856 S.W.2d 331, 332–33 (Mo. banc 1993).

■ Silvey relies on *State v. Williams,* 858 S.W.2d 796 (Mo.App.1993). In *Williams,* the Court of Appeals, Eastern District, held that the trial court had committed plain error in failing to declare a mistrial after an expert witness in a child sex abuse case improperly commented on the alleged victim's credibility. The expert testified:

> There are only two people who know whether a child has been sexually abused, the child and the person who abused them, and very rarely do children lie about it, especially 8–year olds or 7–year olds.... Incidents of lying among children is very low, less than three percent.

*Id.* at 800. The court held that the expert's testimony went beyond admissible testimony concerning general, behavioral characteristics of sexually abused children. The expert, in effect, vouched for the alleged victim's credibility. *Id.* at 801.

The court in *Williams* made clear, however, that there are generally two types of expert testimony challenged in child sexual abuse cases:

> 1) general testimony describing behaviors and other characteristics commonly observed in sexually abused victims (often called general "profile" testimony); and 2) particularized testimony concerning the alleged victim's credibility. While the trial court has great discretion in admitting the former, the latter usurps the province of the trier of fact and is inadmissible.

*Id.* at 798–99 (citation omitted).

The expert testimony given by Boniello was clearly in the first category. Boniello testified that he had observed several behavioral indicators in A.P. that were consistent with sexual abuse. Boniello did not offer an opinion as to whether A.P. suffered abuse at the hand of Silvey. Nor did he offer any opinion as to A.P.'s credibility, or the credibility of abuse victims in general. The only conclusion drawn by Boniello was that A.P. exhibited several behavioral indicators consistent with a child that has been sexually abused. This conclusion is clearly within the province of allowable expert testimony and did not invade the province of the jury. The trial court did not, therefore, err in failing to declare a mistrial after Boniello's testimony. Point denied.

## VII.

■ Next, Silvey argues that the motion court erred in overruling his Rule 29.15 claim that his counsel was ineffective in failing to use a peremptory challenge to strike Mary Teegarden from the venire after the trial court refused to strike her for cause. Although Silvey raised this ineffective assistance of counsel claim in his Rule 29.15 motion, he did not present any evidence on this contention at the motion hearing. The motion court did not issue a factual finding on this issue.

Our review of the denial of post-conviction relief is "limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." *Rule 29.15(j).* It is the movant's burden to prove the grounds asserted in the motion by a preponderance of the evidence. *Rule 29.15(h).* By not presenting evidence on this issue, Silvey failed to meet his burden and deprived the court of the opportunity to make a factual finding on the allegation. Since no findings were required of the court, there is nothing for this Court to review. See, *State v. Simmons,* 825 S.W.2d 361, 365–66 (Mo.App.1992). Point denied.

## VIII.

Next, Silvey argues that the motion court erred in failing to make findings of fact regarding the alleged ineffective assistance of counsel for failing to strike juror Mary Teegarden. As previously noted, Silvey failed to even mention, much less offer any evidence regarding this claim in his Rule 29.15 hearing. "Where a movant has failed to provide substantive evidence at a hearing to support

an allegation, a court cannot be found to have erred by not making findings on that allegation." *Simmons*, 825 S.W.2d at 365. Point denied.

## IX.

Next, Silvey argues that the trial court erred when it allowed out of court statements made by A.P. to S.S., V.S., and Michael Boniello to be admitted pursuant to section 491.075, RSMo 1986. Silvey asserts that the statements improperly bolstered A.P.'s testimony and were of insufficient indicia of reliability to be allowed under section 491.075.

Silvey cites *State v. Seever*, 733 S.W.2d 438, 441 (Mo. banc 1987), as support for his improper bolstering argument. In *Seever*, this Court found that the admission of a videotaped statement of a child witness, prepared pursuant to section 492.304, who also testified in person, impermissibly bolstered the child's testimony at trial. The bolstering was improper because it effectively allowed the witness to testify twice. *Seever* is inapplicable to the present case. Section 492.304 allows for the preparation of a videotape in a child sexual abuse case as a quasi-deposition to relate the child's testimony. What *Seever* prohibits is the use of such a videotape to wholly duplicate the live testimony of the child witness. The statements testified to by S.S., V.S. and Boniello in this case were admitted under section 491.075, which creates a hearsay exception for statements made by sexual abuse victims under the age of twelve. The statements, which were informal and not planned as a substitute for A.P.'s testimony, did not improperly bolster A.P.'s testimony because the statements, even taken together, did not repeat A.P.'s testimony to the extent that it had the effect of allowing A.P. to testify twice. Thus, the statements were not within the purview of the bolstering rule applied in *Seever. See State v. Wright*, 751 S.W.2d 48, 53 (Mo. banc 1988).

Silvey also argues that the trial court abused its discretion in finding that A.P.'s statements to S.S. and Boniello possessed sufficient indicia of reliability under section 491.075, which provides in part:

1. A statement made by a child under the age of twelve relating to an offense under chapter 565, 566, or 568, RSMo, performed with or on a child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) the court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings; or

(b) Is unavailable as a witness.

§ *491.075.1*, RSMo 1986 (amended 1992).

In this case, the requirements of confrontation were satisfied because A.P. testified at trial and was subject to cross examination. Further, the court held a pre-trial hearing on the reliability of the statements that S.S. and Michael Boniello would testify were made by A.P. The trial court found that the statements were reliable and admissible as substantive evidence. The trial court is given discretion in determining the indicia of reliability under section 491.075. *State v. Whittle*, 813 S.W.2d 336, 341 (Mo.App.1991). After reviewing the statements testified to by S.S. and Michael Boniello and considering the time, content, and circumstances at the time the statements were made, *see Wright*, 751 S.W.2d at 52, we cannot say that the trial court abused its discretion in ruling that the statements possessed sufficient indicia of reliability. Point denied.

## X.

Next, Silvey argues that the trial court erred in overruling his motion for acquittal at the close of all the evidence because the evidence was insufficient to support the guilty verdict. The evidence was insufficient, according to Silvey, because A.P.'s testimony was not corroborated as required and A.P.'s testimony was so inconsistent and contradictory as to deprive it of any probative force.

In reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to the State and disregard all evidence and inferences to the contrary. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993). "[R]eview is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989).

A.P.'s testimony was to some extent contradictory and inconsistent.[2] However, inconsistent or contradictory statements by a young child relating a sexual experience does not, in itself, deprive the testimony of all probative force. Although A.P. made inconsistent statements on cross and recross, her testimony on direct examination included an explicit description of the conduct which proved the elements of the charged offense. Thus, the prima facie case was made. *See State v. Durbin,* 834 S.W.2d 837, 839 (Mo. App.1992); *State v. White,* 674 S.W.2d 551, 553 (Mo.App.1984). A.P.'s testimony was not, therefore, so contradictory or inconsistent as to deprive it of all probative force. Any contradictions or inconsistencies were properly weighed by the jury in their determination of A.P.'s credibility.

Silvey argues that, even if A.P.'s testimony was not so contradictory or inconsistent as to deprive it of all probative force, it was necessary for the State to corroborate the testimony. "Corroboration is not mandated unless the victim's testimony is so contradictory and in conflict with physical facts, surrounding circumstances and common experience, that its validity is thereby rendered doubtful." *State v. Harris,* 620 S.W.2d 349, 353 (Mo. banc 1981). Although A.P.'s answers on direct examination differed from those on cross examination, her testimony did not conflict with physical facts, surrounding circumstances and common experience. Therefore, A.P.'s testimony was sufficient, without corroboration, to sustain Silvey's convictions, and any contradictions and inconsistencies in her testimony were properly assessed by the jury in determining A.P.'s credibility. Point denied.

## XI.

Lastly, Silvey argues that the reasonable doubt instruction, patterned after MAI–CR 3d 302.04, submitted to the jury violated his right to due process by defining "reasonable doubt" as a doubt that leaves jurors "firmly convinced" of the defendant's guilt. Silvey cites *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), as support. We hold, as we have consistently held, that the definition is constitutional. *See State v. Williams,* 871 S.W.2d 450, 454 (Mo. banc 1994); *State v. Harris,* 870 S.W.2d 798, 811 (Mo. banc 1994); *State v. Shurn,* 866 S.W.2d 447, 462 (Mo. banc 1993); *State v. Ervin,* 835 S.W.2d 905, 924 (Mo. banc 1992); and *State v. Griffin,* 818 S.W.2d 278, 282 (Mo. banc 1991). Point denied.

## CONCLUSION

This Court affirms the judgments.

All concur.

---

**2.** On direct, A.P. testified in graphic detail Silvey's acts of forcing her to perform oral sex. However, during cross-examination A.P. was asked about a statement she made to a DFS worker about Silvey "rubbing her butt," and A.P. testified that was all Silvey had done. On redirect, A.P. stated that he had only "rubbed her butt" on that occasion, but had forced her to perform oral sex on another occasion. On recross, A.P. said that all she told the DFS worker was that he had "rubbed her butt" and that was all he had done. On redirect, A.P. again reiterated that Silvey had forced her to perform oral sex. On recross, A.P. said that she had dreams and the things that Silvey had done to her occurred in the dreams. On redirect, A.P. testified that Silvey had done the things she had described on direct examination both when she was awake and in her dreams.