**STATE of Missouri, Plaintiff–Respondent,**

v.

**Billy M. WALKER, Defendant–Appellant.**

**No. 21886.**

Missouri Court of Appeals,
Southern District,
Division Two.

July 20, 1998.

Rebecca L. Kurz, Asst. Public Defender, Kansas City, for Defendant–Appellant.

Jeremiah W.(Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for Plaintiff–Respondent.

PER CURIAM.

Billy M. Walker (Defendant) appeals from a jury verdict rendered in the Circuit Court of Lawrence County.[1] The jury found Defendant guilty of second degree felony murder for his role in the events that led to the murder of Troy Joe Reagan, Sr.[2] The trial court sentenced Defendant, in accordance with the jury's recommendation, to the Missouri Department of Corrections for a term of twenty-five years. We affirm.

Defendant does not challenge the sufficiency of the evidence to support his conviction. We view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict. *State v. Skillicorn*, 944 S.W.2d 877, 884 (Mo. banc 1997).

On October 24, 1996, Defendant was home with his friend, Jeff Logan (Logan), in Stone County, Missouri. Logan is a quadriplegic and confined to a wheelchair. Logan has limited use of his arms. Defendant described Logan as a "drug dealer." During the afternoon hours, Defendant and Logan prepared to complete a drug transaction. Defendant counted out two sums of cash, $53,000.00 and $15,000.00, respectively, to be used as payment for the drug transaction. The cash belonged to Logan and Defendant placed the two sums of cash with Logan, concealed on his person and in his wheelchair. Logan wanted to purchase Methamphetamine.

Logan instructed Defendant to drive Logan's blue van to the Trace Hollow Store in Stone County. Logan was seated in his wheelchair behind Defendant while riding in the van. According to Defendant, another man entered the van while they were stopped at the store. Defendant variously identified this man as "Tommy," "The Reverend," and the "Piggly Wiggly Man." Defendant asserted that this man was an assassin from Arkansas. Two days earlier, Defendant testified that he heard Logan say that "it would be worth $20,000.00 for the S.O.B. [Troy Joe Reagan, Sr.] to be killed."

While driving along, Defendant testified that Logan said, "we'll see Joe Reagan." Defendant thought that Logan was going to complete a drug transaction with Troy Joe Reagan, Sr. (Reagan). Defendant drove the van to Reagan's home, located in Stone County, arriving at approximately 5:30 p.m.

Defendant exited the van and spoke to Reagan's wife. Reagan's wife told Defendant that Reagan was at "the shop," located a short distance down the road from Reagan's residence.

Defendant drove the van to "the shop" and found Reagan. Reagan voluntarily entered the van and Defendant drove away with Reagan seated in the front passenger's seat. According to Defendant, Logan was seated in his wheelchair behind Defendant and the "Piggly Wiggly Man" was "squatted down" behind the front passenger's seat.

While traveling along Reagan Road, a short distance from "the shop" and toward Highway 86 in Stone County, Reagan was stabbed in his chest with a knife. Reagan then leaned over toward Defendant and attempted to escape out the driver's side window.[3] Defendant slowed the speed of the van and stopped. Defendant pushed Reagan out from the driver's side window of the van and onto the middle of the roadway. Defendant then drove away.

Shortly after Reagan was pushed out of the van, Reagan's son, Tim Reagan, saw a

---

**1.** A two-count felony information was filed against Defendant in Stone County, Missouri, on January 3, 1997. Count I charged Defendant with first degree murder and Count II charged Defendant with armed criminal action. *See* §§ 565.020, 571.015, RSMo 1994. This case was transferred to Lawrence County, Missouri, for trial. The State withdrew Count II prior to the first day of trial.

**2.** *See* § 565.021.1(2), RSMo 1994; *see also State v. O'Dell*, 684 S.W.2d 453, 460–61 (Mo.App. 1984).

**3.** The door to the passenger's side of the van had no handle to open the door and the window was in an up position.

blue van traveling at a high rate of speed in the opposite direction from his lane of travel on Reagan Road. After passing the blue van, Tim Reagan discovered his father lying on the road, covered with blood. Tim Reagan testified that "all I saw was the blood." When Tim Reagan approached his father, the elder Reagan said "[t]hey stabbed me in the heart, I'm dying." Tim Reagan asked his father who stabbed him, and Reagan related to his son, twice, "Jeff Logan had it done." Reagan died a few minutes later. Tim Reagan gave a statement to various law enforcement personnel concerning seeing a blue van just before he discovered his father and also related the statements that his father made.

Reagan died from the penetration of a knife blade into his upper chest, which punctured his left lung and severed an artery. Reagan lost approximately one quart of blood outside of his body and another two quarts of blood settled within his chest cavity.

Following an investigation by Missouri State Highway Patrol Sergeant Mike Rogers and other law enforcement personnel, which included the discovery of the van in which Reagan was stabbed and statements obtained from persons Defendant was in contact with immediately following the homicide, Defendant became a suspect and an arrest warrant was issued for his apprehension.

The day following the homicide, Defendant obtained a bus ticket and began traveling to Fargo, North Dakota. Defendant was apprehended on October 27, 1996, by law enforcement authorities in Dickinson, North Dakota. When he was arrested, Defendant had in his possession some extra clothes and, according to Defendant, "three pounds of pot." Defendant testified that he planned to use the "three pound of pot" to finance his trip to Quincy, Washington. Defendant was informed that he was being held for first degree murder and armed criminal action for the homicide of Reagan. Defendant signed a waiver of extradition and acquiesced to being returned to Missouri from North Dakota.

At trial, Defendant testified that he was present in the van when Reagan was stabbed. Defendant denied, however, that he stabbed Reagan. Defendant testified that Logan hired an assassin from Arkansas to murder Reagan. The assassin was the "Piggly Wiggly Man" and was the second passenger in the van along with Logan. According to Defendant, it was the "Piggly Wiggly Man" who murdered Reagan.[4]

The State presented its case to the jury on the theory that Defendant stabbed Reagan and was guilty of first degree murder and that there was no "Piggly Wiggly Man." The trial court instructed the jury, however, on first degree murder, second degree murder, and second degree felony murder.[5] The jury found Defendant guilty of second degree felony murder and recommended a sentence of twenty-five years.

## I.

On appeal to this Court, Defendant assigns one point of trial court error. Defendant avers that the trial court erred in admitting in evidence State's Exhibits 8, 9, 10, 11, 13, 99 and 100 over his objections and that the trial court plainly erred in admitting in evidence Exhibits 8 through 15, inclusive, and 94 through 101, inclusive.

The exhibits that Defendant complains of were photographs of the victim's body, taken at the crime scene and at the medical examiner's laboratory. Defendant asserts that exhibits 8, 9, 10, 11 and 13 were cumulative, that exhibits 99 and 100 contained unfair and inaccurate depictions of the victim's injuries, and that exhibits 8 through 15 and 94 through 101 were "extremely gruesome" in

---

4. As a possible motive for the murder of Reagan, Sergeant Rogers testified that his investigation into the homicide of Reagan revealed that the reason that Logan wanted Reagan dead was due to Reagan refusing to become involved in the distribution of Methamphetamine with Logan. Sergeant Rogers testified that Reagan was a major "marijuana dealer" in Stone County, Missouri, for several years but that Reagan did not desire to become involved in the distribution of Methamphetamine. Sergeant Rogers is in charge of the Division of Drug and Crime Control for Troop D in Southwest Missouri.

5. This instruction was supported by the theory that during the course of the events that led to Reagan's murder, Defendant participated in an attempt to distribute a controlled substance. *See* § 565.021.1(2), RSMo 1994.

that their probative value was outweighed by their prejudicial effect.

"The trial court is vested with broad discretion in the admission of photographs." *State v. Rousan,* 961 S.W.2d 831, 844 (Mo. banc 1998); *Skillicorn,* 944 S.W.2d at 886. Photographs are relevant if they show the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony. *Id.; State v. Feltrop,* 803 S.W.2d 1, 10 (Mo. banc 1991), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). "A photograph is not rendered inadmissible simply because other evidence described what is shown in the photograph." *Id.* "If a photograph is relevant, it should not be excluded simply because it may be inflammatory." *Id.* "As with other relevant evidence, a photograph should not be excluded from evidence unless its prejudicial effect is greater than its probative value." *Id.* The State is not precluded from introducing photographs in evidence merely because the defendant expresses a willingness to stipulate to some of the issues involved. *Skillicorn,* 944 S.W.2d at 886.

"Insofar as photographs tend to be shocking or gruesome, it is almost always because the crime is shocking or gruesome." *Rousan,* 961 S.W.2d at 844; *see also State v. Hill,* 866 S.W.2d 160, 165 (Mo.App.1993) (defendant not entitled to complain of a portrayal which is accurate merely because the consequences of the crime are shocking to persons of ordinary sensibilities).

Defendant declared in his brief that at trial he "conceded that he was guilty of second degree murder, so the photographs did not prejudice him as to the determination of guilt. . . ." Defendant averred, however, that the "[a]dmission of the photographs prejudiced [him], because the inflammatory and gruesome nature of the photographs influenced the jury to recommend a higher sentence." As previously noted, Defendant received a twenty-five year sentence.

Defendant argues that exhibits 8, 9, 10, 11 and 13 were cumulative. These five exhibits were admitted through the testimony of the paramedic who recovered Reagan's body from the crime scene. Exhibits 8 and 10 depict Reagan's body from two angles, from different distances, as it was discovered lying on the roadway. Exhibits 9, 11 and 13 depict the fatal stab wound to Reagan's chest. These exhibits showed the scene of the crime, the identity of Reagan, the condition and location of Reagan's body, and they assisted the jury in understanding the testimony of the paramedic and the medical examiner. *See Rousan,* 961 S.W.2d at 844; *Hill,* 866 S.W.2d at 165. These exhibits were not cumulative, and we find no abuse of trial court discretion in admitting these exhibits in evidence.

Defendant also contends that exhibits 99 and 100 unfairly depicted Reagan's stab wound because the knife used in the demonstration was not the "actual knife used in the offense" and was "not relevant to a material issue." These two exhibits depict Reagan's unclothed chest area with the deputy medical examiner, wearing white, surgical gloves, holding a knife that has been inserted inside the stab wound to Reagan's chest. The photographs depict the depth of the stab wound and the angle in which the knife was plunged into Reagan's chest. Only the deputy medical examiner's covered lower arms and gloved hands are shown in the two photographs with Reagan. Exhibits 99 and 100 were relevant to show the "nature and extent of the wounds" and the "cause of [Reagan's] death," and they were relevant and admissible to aid the jury in understanding the medical examiner's testimony in that regard. *See Rousan,* 961 S.W.2d at 844; *Hill,* 866 S.W.2d at 165. We do not find that exhibits 99 and 100 were unfair and inaccurate depictions of Reagan's injuries as Defendant contends.

Further, "[t]here is no absolute rule that demonstrative evidence of a weapon unconnected with the defendant or offense charged is inadmissible." *State v. Silvey,* 894 S.W.2d 662, 667 (Mo. banc 1995). We are persuaded that the use of the knife in this case by the medical examiner to demonstrate

the angle in which the knife entered Reagan's chest and the depth of the wound was probative of a material issue in this case. *See generally Silvey*, 894 S.W.2d at 667–68. Defendant was charged with first degree murder. The State sought to establish that the nature and angle of the stab wound suggested that it was likely that Defendant inflicted the stab wound to Reagan, gripping the knife in his right hand, while Defendant was occupying the driver's seat of the van and while Reagan was seated in the front passenger's seat of the van. *See id.*

■ "The trial judge occupies a superior vantage point for balancing probative value and prejudicial effect of demonstrative evidence." *Id.* at 669. "Thus, the trial judge is necessarily vested with broad discretion in admitting or rejecting such evidence." *Id.* We find no abuse of trial court discretion in admitting exhibits 99 and 100 in evidence.

■ Defendant also maintains that the trial court "plainly erred" in admitting in evidence exhibits 8 through 15, inclusive, and 94 through 101, inclusive, because all of the exhibits were "extremely gruesome" and their probative value was outweighed by their prejudicial effect. Defendant failed to object during trial on the grounds that the photographs were "extremely gruesome." Therefore, Defendant's assertion of trial court error is eligible only for plain error review. *See* Rule 30.20, Missouri Court Rules (1998).

■ "To prevail on plain error review, the defendant must show that the trial court's error so substantially violated his rights that manifest injustice or a miscarriage of justice results if the error is not corrected." *Skillicorn*, 944 S.W.2d at 884.

■ "Photographs, although gruesome, may be admitted where they show the nature and location of wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case." *Id.* at 886; *see also Hill*, 866 S.W.2d at 165.

■ In our gratuitous review of Defendant's contention, we find no plain error in the admission of exhibits 8 through 15, inclu-

sive, and 94 through 101, inclusive, in evidence. The photographs, although upsetting and unpleasant to view, showed the location and nature of Reagan's wounds, and they aided the jury in better understanding the testimony of the medical examiner. *See Rousan*, 961 S.W.2d at 844; *Skillicorn*, 944 S.W.2d at 886; *see also State v. Smith*, 944 S.W.2d 901, 914–15 (Mo. banc 1997).

In sum, each of the photographs that Defendant complains of on appeal were relevant, and this Court cannot say that the allegedly prejudicial impact of these photographs outweighed their probative value. There was no abuse of trial court discretion in the admission of any of the exhibits Defendant complains of on appeal. *See Rousan*, 961 S.W.2d at 845. Point denied.

The judgment is affirmed.