247 S.W.2d 800 (1952)
LEWIS et al.
v.
LOWE & CAMPBELL ATHLETIC GOODS CO. et al.
No. 42673.
Supreme Court of Missouri, Division No. 1.
April 14, 1952.
*801 Moser, Marsalek, Carpenter, Cleary & Carter and J. C. Jaeckel, St. Louis, for appellants.
Charles M. Warner, Ernest E. Baker, St. Louis, for respondents.
HOLLINGSWORTH, Judge.
Defendants appeal from a judgment of the Circuit Court of St. Louis County affirming an award of compensation in the sum of $12,150, made by the Industrial Commission of Missouri, Division of Workmen's Compensation, in favor of claimants, the widow and minor children of Russell B. Lewis, against his employer, Lowe & Campbell Athletic Goods Company, and its insurer, Maryland Casualty Company.
Russell B. Lewis was killed in an automobile accident between the hours of 3:30 and 4:00 o'clock on Sunday morning, October 2, 1949, on U. S. Highway 66, north of Ladue Road, in St. Louis County. The Referee, and the full Commission on review, found that he was "on a trip for his employer" and that the accident arose out of and in the course of his employment.
Appellants assert that the award and the judgment affirming it are without support of any competent evidence and cannot stand. The sole matter for determination is, therefore, whether the award is supported by competent and substantial evidence upon the whole record. Seabaugh's Dependents v. Garver Lumber Company, 355 Mo. 1153, 200 S.W.2d 55; Scott v. Wheelock Bros., Inc., 357 Mo. 480, 209 S.W.2d 149. Determination of this question requires a detailed statement of the evidence relating to the scope of Lewis' employment and the purpose of the trip during which he was killed.
Mr. Lewis resided with his family at 8017 Washington, Vinita Park, St. Louis County. He was and for more than four years had been in the employ of Lowe & Campbell Athletic Goods Company as a salesman of athletic paraphernalia, working out of his employer's branch office in St. Louis. His territory embraced the southeastern portion of Missouri, including, among others, the cities of Potosi, in Washington County, and Pacific, in Franklin County. He called upon schools for the purpose of selling football and basketball equipment and upon golf professionals and dealers. He used his own automobile in the performance of his duties and was allowed his expenses in so doing. He planned his own trips, had no regular hours, did not leave his home or return thereto at regular hours, and was away from home on many holidays and about ten per cent of week ends. He was supplied with and kept in his car brief-cases, catalogs, expense account forms, stationery, and samples of football, basketball, golf, tennis and other seasonal equipment. He was also fond of hunting and kept a shotgun and hunting clothing in his car.
Lewis was hired by Creed Joyce, manager of his employer's St. Louis office and worked under Mr. Joyce's general supervision. At the time Lewis was hired, Joyce told him that he was to work nights and Sundays, if necessary to get the business. He was also told by Joyce that his *802 employer believed in entertaining customers and that his expenses incurred in so doing would be paid by the employer.
Mr. Joyce testified that expense accounts of salesmen who went on hunting and fishing trips with customers in order to promote good will were regularly approved, and that for the past four or five years Lewis had attended meetings of the Franklin County Schoolmasters Association held at a cabin owned by Sam Sprout at Coldwater, Missouri, and that the employer had paid a part of the expenses incurred at these meetings.
Weekly news bulletins were furnished by the employer to deceased containing suggestions as to sales promotion. Among these was one containing the following, encircled in blue pencil by deceased's supervisor: "The older salesmen will tell you their best sales are made on Saturday and Sunday and that's because the coach has time to talk to you. The old timers work nights, too. * * *" Another, also similarly encircled, read: "* * * The fellow who leaves home Tuesday morning and gets back Fridayand, yes, some do is not going to get very far. * * *"
Among the customers of his employer upon whom Lewis regularly called and sold employer's merchandise were Herbert Baker, principal of the high school at Pacific; J. D. Wilson, superintendent of a consolidated school district, also residing in Pacific; and Rolin Jones, superintendent and purchasing agent of a reorganized school district, residing at Potosi.
On September 12th, Lewis met Herbert Baker and J. D. Wilson, two of the aforesaid customers, in Wilson's office in Pacific. Also present was Sam Sprout, who represented Rand-McNally Company, which company sells school supplies. Sprout, as stated, owned the above mentioned clubhouse at Coldwater, about forty miles southeast of Potosi, whereat he had arranged to entertain the Franklin County Schoolmasters Association on October 2nd. Sprout, in the presence of Baker and Wilson, asked Lewis to come to the clubhouse on the week end of October 2nd and to share the expense of the entertainment. The Referee sustained an objection to elicitation of Lewis' answer, whereupon claimants offered to prove that Lewis said he would go to the clubhouse over that week end. On September 24th, Sprout mailed a letter addressed to Lewis in care of "Lowe & Campbell Athletic Goods, 321 N. 14th Street", St. Louis. Over objection of appellants a duly identified carbon copy of that letter was placed in evidence. It reads:
"Formal arrangements are being formulated for the trip to my cabin. The school people of Franklin County have all been sent a letter by Dave Max. I hope we have a good crowd.
"Since you are not certain that you can be there early Saturday I think it is best that I get the [refreshments], and we can divide the expense when it is over. All meals will be taken at the lodge. Will look forward to seeing you Saturday."
(The Association was entertained by Sprout at the clubhouse on October 2nd.)
On September 28th or 29th, three or four days before Lewis was killed on October 2nd, he called on Mr. Jones, the purchasing agent of the reorganized school district of Potosi. Jones testified that on that occasion he gave Lewis an order for merchandise and inquired when some basketball suits ordered in the spring for fall delivery would be delivered. Jones was perturbed because they had not arrived. Lewis told Jones he would check into the matter immediately and that in all probability he would be back or through Potosi over the week end. (At one point in his testimony witness used the words "a week end"; at another he said "the week end".)
In connection with this phase of the evidence, Mr. Joyce, Lewis' supervisor, testified on cross examination: "Q. Mr. Joyce, if Mr. Lewis had wanted to communicate with Mr. Rolin Jones in any way about any basketball suits * * * he could have done that by telephone or telegraph or by letter? Isn't that true? A. Yes."
And on redirect examination: "Q. Mr. Joyce, as salesman or as manager for Lowe and Campbell, did you encourage *803 your men to contact their customers by telephone, telegraph or letter, or by personal contact? A. By personal contact."
(The evidence also showed that Lewis did not advise Jones by telephone, telegram or letter as to the probable date of delivery of the basketball suits.)
On this same occasion, September 28th or 29th, Joe Gibson, Jones' Secretary, and Ralph Corse, athletic director and coach of softball, basketball and track at Potosi High School, were present. There was some talk about hunting. Corse testified he told Lewis that squirrel hunting was good around Potosi, and if he wanted to go hunting with them over the week end, "we were leaving that morning before six o'clock but that we would wait on him until six." Jones had lunch with Lewis and they conversed about hunting. Lewis asked Jones if he was a hunter, to which Jones replied he was not much of a hunter and did not have much equipment. Lewis asked Jones if he would go along with him if he came down, and Jones said Lewis would have to furnish the equipment.
On Saturday, October 1st, Lewis did not go out on his territory. He went to his employer's office that day. That evening after, and probably before, dinner, he told Mrs. Lewis he would have to leave early the next morning; that it was necessary because they had some unfinished work down at Potosi that needed to be finished; that they were meeting early to have a hunt at the same time; and that he would try to be back in time to hear the broadcast of the World Series baseball game that afternoon. On cross examination, Mrs. Lewis testified he told her he had obtained an order for some basketball suits some time previous to that date, these suits had not been delivered and the purchaser had inquired as to when deliveries were to be made, and he was going to tell them on that Sunday, October 2nd, when delivery was likely to be made.
Upon retiring that night, Lewis set the alarm clock for 3:00 a. m. He was ready to leave at 3:30 a. m. Mrs. Lewis remained in bed and did not see him leave. At a point on U. S. Highway 66 By-Pass, also known as Lindbergh Road, two blocks north of Ladue Road in St. Louis County, his car was involved in a collision with another car between 3:30 and 4:00 a. m., and he was fatally injured.
A briefcase and samples, including basketball shoes, pants and shirts, and a hunting coat and trousers, were recovered from his automobile. Golf balls and shotgun shells were scattered along the highway. A shotgun was in the trunk of the car. On Saturday, October 1st, Mrs. Lewis observed that he had the samples and equipment that he carried in his work. No contention is made that he was not proceeding along a regularly travelled route to Potosi at the time of the collision.
Appellants contend that in view of the testimony to the effect it was not necessary for Lewis to make a trip to Potosi to inform Jones when the basketball suits would be delivered, the only evidence in the record bearing directly upon and explanatory of the mission upon which Russell B. Lewis was engaged at the time of his death is the testimony of Mrs. Lewis and the testimony of Ralph Corse in regard to the hunting trip scheduled for Sunday morning, October 2d, and that the testimony of both these witnesses was based upon hearsay, and the testimony of Mrs. Lewis was also based upon self-serving declarations of deceased. (Appellants made timely objection to the admission of all of this testimony.) They further contend that even if it be held the testimony of these witnesses was properly admitted, all of the evidence in the case was insufficient to prove that Lewis's death arose out of and in the course of his employment.
In support of their contention as to the testimony of Mrs. Lewis, appellants cite the cases of Boyer Chemical Laboratory v. Industrial Commission, 366 Ill. 635, 10 N.E. 2d 389, 113 A.L.R. 264; Patton v. L. O. Brayton & Co., 184 Tenn. 592, 201 S.W.2d 981; McComb v. Vaughn, 358 Mo. 951, 218 S.W.2d 548.
In the Boyer case, the general doctrine is announced that statements made by a deceased person at the time of his departure on a journey, with reference to his destination, may be proved, but in order to be admissible as part of the res gestae the statement *804 must be immediately connected with the act of departure. In the Patton case, deceased told a witness he might have to drive to a certain town for a special purpose connected with his employer's business. The court said this statement, under the facts in that case, was an incompetent, self-serving declaration and not a part of the res gestae. However, the case was ultimately determined upon the court's conclusion that the evidence established deceased was on his own personal business at the time he was fatally injured. The McComb case is readily distinguishable from this case. It was an action for damages for the death of plaintiff's decedent who was killed in a collision of a motorcycle ridden by decedent and defendant's truck. Decedent made a statement forty minutes before the collision that he had come from another town without lights and oncoming vehicles had blinded him. It was held that an admission of a prior act of negligence on the part of decedent was not admissible on the issue of his alleged similar negligence in that case.
In support of their contention that the testimony of Corse as to the hunting trip was hearsay, appellants cite: Marshall Medicine Co. v. Chicago & A. R. Co., 126 Mo.App. 455, 104 S.W. 478; Southern Home Ins. Co. of the Carolinas v. Boatwright, 234 Ala. 668, 176 So. 460; Frangos v. Edmunds, 179 Or. 577, 173 P.2d 596; Southwestern Telegraph & Telephone Co. v. Thompson, Tex.Civ.App., 157 S.W. 1185; Leffingwell v. Faubion, 89 Cal.App. 157, 264 P. 306; Konidaris v. Burgess, 223 Ala. 512, 137 So. 303. We have carefully read each of those cases and find none of them applicable to the testimony under consideration here.
The courts of this State have frequently declared that declarations made contemporaneously with, or immediately preparatory to, a particular litigated act, which tend to illustrate and give character to the act in question are admissible as a part of the res gestae. Edwards v. Ethyl Gasoline Corp., 342 Mo. 98, 112 S.W.2d 555, 561, and cases there cited; Koonse v. Missouri Pac. R. Co., 322 Mo. 813, 18 S.W.2d 467. We think the statement made by Lewis to his wife on the evening of October 1st in connection with his act of setting the alarm clock to awaken him at 3:00 a.m., amounted to a declaration made in connection with an act immediately preparatory to his mission and, in that sense, could be held to constitute a part of the res gestae. Preparations for an early morning departure are, for obvious reasons, frequently made the evening before. However, we are convinced that if, under the evidence, it may reasonably be inferred that these statements were made by Lewis as spontaneous and truthful declarations of a then present intent on his part to make the trip for the purposes stated by him, then they are admissible, not as a part of the res gestae, but as circumstances tending to prove the fact that the trip was made for those purposes.
"A declaration indicating a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed. * * *
"* * * On the other hand, no requirement exists that the making of a declaration indicating intent or intention should be contemporaneous with the time when its existence is relevant, but the test is logic rather than time, and, within limits prescribed by the rules as to remoteness, prior or subsequent, as well as accompanying, statements are competent.
"* * * It has also been declared that such a declaration, to be admissible, must appear to have been made in a natural manner, and not under circumstances of suspicion." 31 C.J.S., Evidence, § 256, p. 1009.
This rule, the reasons therefor and cases cited in support thereof are set forth at some length in Vol. VI, Wigmore on Evidence, 3rd Ed., § 1725, p. 79 et seq.:
"It has already been seen that the existence of a design or plan to do a specific act is relevant to show that the act was probably done as planned. The design or plan, being thus in its turn a fact to be proved, may be evidenced *805 circumstantially by the person's conduct. But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present [hearsay] Exception by the person's own statements as to its existence.
"The only limitations as to the use of such statements (assuming the fact of the design to be relevant) are those suggested by the general principle of this Exception, namely the statements must be of a present existing state of mind, and must appear to have been made in a natural manner and not under circumstances of suspicion. The following passages expound and illustrate the principle:
"1878, Beasley, C. J., in Hunter v. State, 40 N.J.L. 495 (admitting statements of the deceased at Philadelphia that he was then going to Camden with the accused on business): `In the ordinary course of things, it was the usual information that a man about leaving home would communicate, for the convenience of his family, the information of his friends, or the regulation of his business. At the time it was given, such declarations could, in the nature of things, mean harm to no one; he who uttered them was bent on no expedition of mischief or wrong; and the attitude of affairs at the time entirely explodes the idea that such utterances were intended to serve any purpose but that for which they were obviously designed. * * * If it was in the ordinary train of events for this man to leave word or to state where he was going, it seems to me it was equally so for him to say with whom he was going.' * * *"
And in § 1726, pp. 87-88, of the same volume, the author further says: "In a number of precedents sundry declarations of intention (to make a journey, to pay money, or the like) have been excluded, usually without any other apparent reason than the supposed application of the `res gestae' doctrine.
"That doctrine, indeed, has also in some of the rulings admitting this evidence been taken as the source of admissibility. It would be well if the invocation of the `res gestae' doctrine in this connection could be wholly abandoned. The simple and sufficient reason for admission is the Hearsay Exception receiving statements of an existing mental condition. Whether these accompany some conduct relevant in the litigation, or any movement or `act', is wholly immaterial. The labor shown in certain judicial opinions to discover some `act' of which the declarations `are a part' is wasted; such speculations serve only to confuse an otherwise simple situation. For example, Doe is said to have been killed on Friday at Millville; to show that he was there on Friday, a design on Thursday to go there on Friday is relevant. His declaration on Thursday of such a design, if made under circumstances of naturalness, is admissible; and it cannot make any difference whether, * * *, he uttered it in the `act' of leaving the house, or whether, as he sat reading the paper, he said to his wife, `I see that Roe in Millville has failed; I shall go down there the first thing to-morrow morning.'"
Some of the cases wherein this rule was followed are: Mattan v. Hoover Co., 350 Mo. 506, 166 S.W.2d 557, 566, 567; Ervin v. Myrtle Grove Plantation, 206 S.C. 41, 32 S.E.2d 877; Mutual Life Ins. Co. v. Louisville Trust Co., 207 Ky. 654, 269 S.W. 1014. See also Bradley v. Modern Woodmen, 146 Mo.App. 428, 124 S. W. 69.
With the rule and its limitations in mind, we briefly examine the evidence.
Mr. Lewis' duties were twofold, (a) to sell his employer's goods and (b) to promote good will. He was admonished to work nights and Sundays and to entertain and keep in close personal contact with the customers. The engagement made with Sprout to attend the schoolmasters meeting was definitely shown to be within the usual scope of his employment. The engagement he made with Jones to personally advise Jones as to the probable shipping date of the basketball suits was clearly within the scope of his work, and *806 the testimony of Lewis' supervisor, Joyce, warrants an inference that a personal call to give the information would be the preferred manner of imparting it. At any rate, the fact that it may have been transmitted by telephone, telegram or letter is but a circumstance for consideration of the Commission. The engagement (it may be termed a tentative one) made with Corse, Jones and Gibson as to the early morning hunting trip may well be inferred to be within the scope and contemplation of his employment. It is some significance that his supervisor, Joyce, did not deny that such an engagement would be within the scope of his employment. The hour of Lewis' departure tends to establish that he intended to keep the hunting engagement; no other reason for his early departure is suggested. And, finally, the statements made to Mrs. Lewis as to his intent and purpose were statements such as any man of family spontaneously would make prior to arising at 3:00 a. m. to leave on such a journey as the evidence here shows.
No suspicious circumstance or self-serving motive or purpose is apparent or suggested to make of these declarations other than what they purport to be: natural spontaneous declarations of Lewis' present intent at the time each declaration was made to undertake the journey of October 2nd in the due and usual course of his employment. They were made prior to any reasonably possible motive of serving himself or claimants in the event such litigation as this should arise. They were not so remote from the contemplated trip that we may say as a matter of law they had no probative value. Journeys, such as the one here shown, often are planned weeks in advance. The circumstances under which the declarations were made, the time they were made, and the weight to be given them as evidence of Lewis' intentions and purposes were matters for the triers of the fact.
We hold they were competent; and that they, together with the other facts and circumstances, warranted the finding of the Commission that at the time Lewis was killed he was "on a trip for his employer" and that the accident arose out of and in the course of his employment.
The judgment should be, and is, affirmed.
All concur.