**STATE of Missouri, Respondent,**

v.

**Steven Arthur RIOS, Appellant.**

**No. WD 65708.**

Missouri Court of Appeals, Western District.

April 27, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 26, 2007.

Application for Transfer Denied Oct. 30, 2007.

Nancy A. McKerrow, Columbia, MO, for appellant.

Victor Melenbrink, Assistant Attorney General, Jefferson City, MO, for respondent.

Before HOWARD, P.J., BRECKENRIDGE and HARDWICK, JJ.

PATRICIA BRECKENRIDGE, Judge.

Steven Rios appeals his conviction for first degree murder, under section 565.020, RSMo 2000,[1] and armed criminal action, under section 571.015. The trial court sentenced Mr. Rios, according to the jury's recommendation, to life imprisonment without the possibility of parole for the first degree murder count and ten years imprisonment for the armed criminal action count. Mr. Rios raises four points on appeal.

---

**1.** All statutory references are to the Revised Statutes of Missouri 2000.

In his first point, Mr. Rios asserts that the trial court abused its discretion in overruling his objection to the admission of two hearsay statements of the victim. In particular, the first hearsay statement challenged by Mr. Rios concerns a statement made by the victim that he was going to end his relationship with Mr. Rios if he found out that Mr. Rios was married. The second challenged hearsay statement made by the victim was that if Mr. Rios did not take care of a municipal ticket Mr. Rios issued to the victim, that he had a secret that might be of interest to the Columbia Police Department, Mr. Rios's employer.

In his second point on appeal, Mr. Rios claims that the trial court abused its discretion in admitting forty-seven gruesome photographs of the victim's body taken at the scene of the crime and during the autopsy. Mr. Rios contends that the photographs were irrelevant, duplicative, designed to inflame the passions of the jury, and the probative value of the photographs was outweighed by their prejudicial effect.

In his third point on appeal, Mr. Rios contends that the trial court abused its discretion in allowing the State to introduce a Spyderco clip knife purchased by the Columbia Police Department for demonstrative purposes. Mr. Rios claims that the admission of the knife was highly prejudicial because the knife had no connection to the crime or to him, it was irrelevant to any issue in the case, and the admission of the knife carried an undue risk of confusing the jury.

In his fourth point on appeal, Mr. Rios asserts that the trial court abused its discretion in allowing the State to introduce two photographs of the victim taken at a party on the morning he was murdered. Mr. Rios claims that the photographs were irrelevant, were used to arouse the pas-

sions and sympathy of the jury, and any probative value the photographs may have had was overwhelmed by their prejudicial effect.

Because the trial court erred in admitting two statements made by the victim, and the admission of the statements prejudiced Mr. Rios, the trial court's judgment is reversed and the case is remanded for a new trial.

## I. Factual and Procedural Background

During the early morning hours of April 18, 2004, Columbia police officers were dispatched to an apartment on three separate occasions for noise disturbances. Mr. Rios, a police officer with the Columbia Police Department, and Officers Brad Anderson and Kim Jensen responded to the third call. Officer Jensen handcuffed the three occupants of the apartment until the party began to settle down and wrote each a ticket. Meanwhile, Jesse Valencia[2] and another man were on the porch of the apartment. Mr. Rios told both men that they needed to leave. When they refused to leave, Mr. Rios arrested them. Mr. Rios took Mr. Valencia to his patrol car and Officer Anderson took the other man to his patrol car. Both men were issued a court summons for obstructing a police operation and were released. After he was released, Mr. Valencia walked home to his apartment on 1414 Wilson Avenue.

Later that day, Mr. Valencia told one of his friends that the police officer that ticketed him at the party was going to pick him up after he finished working his shift at the Campus Inn. Because Mr. Valencia's friends were curious to see if he was telling the truth, they decided to "stake out" the Campus Inn. While Mr. Valencia's friends did not actually see Mr. Rios pick

---

2. Mr. Valencia was a twenty-three year old    college student at the time.

Mr. Valencia up at the Campus Inn, they later saw Mr. Rios and Mr. Valencia get out of Mr. Rios's black Explorer in front of Mr. Valencia's apartment.

In the early morning hours of May 8, 2004, Mr. Valencia and his friend, Joan Sheridan, were at a party when Ms. Sheridan decided that she was tired and wanted to go home. Because Ms. Sheridan had been drinking, Mr. Valencia told her that she could stay at his apartment, which was nearby. Ms. Sheridan agreed and Mr. Valencia told her that he would be home later. About 3:00 A.M., when Ms. Sheridan was getting ready to go to sleep, someone knocked on Mr. Valencia's door. Thinking that it was Mr. Valencia, Ms. Sheridan opened the door. She was surprised to find Mr. Rios standing outside the door. While Mr. Rios was dressed in civilian clothing, Ms. Sheridan recognized him as the police officer who had responded to a noise complaint at the party that she had attended earlier that evening. Mr. Rios asked Ms. Sheridan if Mr. Valencia was home and asked why she was there. When Ms. Sheridan explained to Mr. Rios why she was there and that Mr. Valencia was not home, Mr. Rios offered Ms. Sheridan a ride home. She refused and Mr. Rios left.

About 1:30 A.M. on the morning of May 14, 2004, Mr. Valencia and a friend, Andy Schermerhorn, went to Mr. Valencia's apartment after going out the previous evening. After arriving, Mr. Valencia and Mr. Schermerhorn began to engage in sexual activity. About 3:00 or 3:30 A.M., Mr. Rios, in his police uniform, knocked on Mr. Valencia's door. Mr. Valencia let Mr. Rios in and Mr. Rios followed Mr. Valencia into the bedroom. All three men engaged in sexual activity. Afterwards, Mr. Rios told Mr. Schermerhorn that the encounter needed to be a secret and asked Mr. Schermerhorn his name. Mr. Schermer-

horn told him that if it needed to be a secret, that he should not tell him his name. When Mr. Rios received a call over his radio, Mr. Valencia asked Mr. Rios when he would see him again. Mr. Rios said it would be a surprise.

On May 20, 2004, Mr. Valencia appeared in court on the summons Mr. Rios issued to him on April 18th. On the probable cause statement of the ticket, Mr. Rios had written, "obstructing a government operation." Rose Wibbenmeyer, a prosecutor for the City of Columbia, amended the ticket and added the language "by physical interference." The amendment made by Ms. Wibbenmeyer, however, merely clarified which section of the ordinance the city was proceeding under and did not change the charge or the penalty. When Mr. Valencia appeared in court, the judge read the additional language added to the ticket by Ms. Wibbenmeyer. Mr. Valencia pleaded not guilty and the case was set for a pretrial conference on June 28, 2004.

Sometime during the week following Mr. Valencia's arraignment, Mr. Valencia had a conversation with Ms. Sheridan about going to court. He told her that the ticket was still in force and that the charges "sounded worse." Ms. Sheridan said that Mr. Valencia was upset about the ticket and that "he thought he wouldn't have had this ticket at this point and that [it] would be gone." Mr. Valencia then told Ms. Sheridan, " '[i]f he doesn't get this ticket taken away,' the police officer didn't get the ticket taken away, he was going to—or he said he had a little secret that he thought the Columbia Police Department might like to know."

In the early morning hours of June 2, 2004, Ms. Sheridan and Mr. Valencia were walking to Mr. Valencia's apartment from a friend's birthday party they had attended. Mr. Valencia had asked Ms. Sheridan if she wanted to spend the night. Even

though Ms. Sheridan thought she could have driven home that night, she agreed to spend the night. While they were walking, Mr. Valencia told Ms. Sheridan, "The police officer might come over tonight." Ms. Sheridan thought that she "probably didn't want to be there then." Mr. Valencia, however, told her, " 'No. No. Just come over and spend the night. I just won't answer the door when he knocks. And just, you know—I'll just stay asleep.' " Mr. Valencia then told Ms. Sheridan, " 'I'm really going to ask him this time if he's married or not. Because if he's married, I don't want to be involved in a relationship with a married man.' "

The next day, June 3, Mr. Valencia went to dinner with several friends and then to a gay dance club. At the club, Mr. Valencia met Edward McDevitt. After the club closed, Mr. Valencia and Mr. McDevitt got a ride to Mr. Valencia's apartment from Jennifer Witherspoon. Ms. Witherspoon gave both men an invitation to a party at her apartment the following evening. When Mr. Valencia and Mr. McDevitt got to Mr. Valencia's apartment, the two engaged in sexual activity. The next morning, after making plans to meet at the party later that evening, Mr. McDevitt left Mr. Valencia's apartment about 10:00 A.M.

After Mr. Valencia got off work about 11:00 P.M. on June 4, he went to the party at Ms. Witherspoon's apartment. When he got to the party, Mr. Valencia called Mr. McDevitt, who had decided that he wanted to go to bed and did not want to go to the party. Mr. McDevitt's roommate, Eric Thurston, however, woke Mr. McDevitt up and convinced him to go out for the evening. Both men eventually ended up at Ms. Witherspoon's party. Sometime between 2:00 and 2:30 A.M., Mr. McDevitt and Mr. Valencia left Ms. Witherspoon's party and went across the street to another party, where they stayed until leaving shortly after 3:00 A.M. The two men chatted for a short time on the sidewalk and Mr. Valencia ultimately invited Mr. McDevitt to his apartment. Mr. McDevitt declined because he had to work the next morning. The two then made plans to get together on Sunday night and Mr. McDevitt left. About 3:13 A.M., Mr. Valencia called Mr. McDevitt on his cell phone to ask one last time if he wanted to come home with him. Again, Mr. McDevitt declined the invitation.

After Mr. McDevitt left, Mr. Valencia returned to Ms. Witherspoon's party, where he spent some time talking with Ms. Witherspoon. Mr. Valencia left Ms. Witherspoon's about 3:30 A.M. The friend of Mr. Valencia who had hosted the party across the street, saw Mr. Valencia walk by about 3:45 A.M. and waved at him. Mr. Valencia returned the wave and said that he was going home to go to sleep. Mr. Valencia then walked away in the direction of his apartment.

Christopher Kepner lived in an apartment next to Mr. Valencia. A "paper thin" interior wall separated their apartments. About 3:00 A.M. that same morning, June 5, 2004, Mr. Kepner returned to his apartment and immediately went to bed. Some time later, a "bumping" on the shared wall between his and Mr. Valencia's apartments awoke Mr. Kepner. The "bumping" continued down the wall toward the front door. Mr. Kepner heard "a really intoxicated kind of slurring voice" say, "Stop it, stop it," and, "No, I'm not sleeping in the car." While Mr. Kepner could hear two voices, he could not make out any other specific statements. Mr. Kepner eventually yelled something like, "Yeah, that's right, stop it. It's late." After Mr. Kepner yelled, the noise immediately stopped. Between 10:00 and 11:00 A.M. the next morning, when Mr. Kepner went outside,

he noticed Mr. Valencia's door was about halfway open.

About 2:00 P.M. on the afternoon of June 5, 2004, Matt Finucane, who lived at 1513 Wilson Avenue, across the street and several houses down the block from Mr. Valencia, discovered Mr. Valencia's dead body between his house and 1517 Wilson Avenue. Mr. Valencia's body, clothed in a pair of blue running shorts, was lying on its back in an awkward position in the grass between the two houses. Mr. Valencia's throat had been slit and there were flies buzzing around the neck wound. Dried blood ran down the sides of Mr. Valencia's neck and over his shoulders. Blood had also pooled underneath Mr. Valencia's upper body. Mr. Finucane immediately called 9–1–1 and Columbia police officers arrived momentarily.

About 5:45 P.M., crime scene technicians placed Mr. Valencia's body in a body bag and transported it to the medical examiner's office. The subsequent autopsy revealed that Mr. Valencia's primary injury was a gaping, incised, neck wound. The wound was longer than it was deep and had severed Mr. Valencia's jugular veins and the muscles on the side of his neck. The injury also nicked Mr. Valencia's spine. The wound had an "equally distant parallel mark pattern," which suggested that a knife with "some degree of serration" caused the wound. In addition, given the nature of the wound and the location of the blood, it was determined that Mr. Valencia must have been unconscious and lying down when his throat was slit.

Mr. Valencia's body also had a number of other injuries, including an injury to his upper lip, a nine-centimeter contusion along his jawline, a bad bruise to his left ear, and a number of contusions and abrasions on his arms, abdomen, hips, and knees. Mr. Valencia also had significant contusions to his chest, upper back, shoulders, and a "tremendous hemorrhage" underneath his chest bruise. Mr. Valencia's eye and larynx also suffered from petechiae hemorrhaging. Such hemorrhaging is consistent with having been rendered unconscious. Mr. Valencia did not have any defensive wounds on his hands or arms.

On the day that Mr. Valencia was murdered, i.e., June 5, Mr. Rios finished working his shift at 3:00 A.M. After the shift ended, Mr. Rios and three other police officers met on the roof of the Columbia Police Department to socialize. While on the roof, the officers drank beer and chatted. As it started to get light outside, the gathering broke up and the officers began to leave. Mr. Rios was the second officer to leave the roof. Columbia Police Dispatcher Leah Wooden left the gathering after Mr. Rios and made a telephone call to officer Jason Jones at 4:57 A.M. while driving out of the parking garage. Ms. Wooden estimated that Mr. Rios left about ten minutes before she did, or at approximately 4:47 A.M. Elizabeth Rios, Mr. Rios's wife, who was up at the time preparing a bottle for their four-month-old son, estimated that Mr. Rios got home sometime between 5:15 A.M. and 5:25 A.M.

Later that day, sometime between 6:00 and 6:30 P.M., Mr. Rios returned to the police station for his shift. When Mr. Rios got to the police station, he asked Sergeant John White what was going on because he had heard that there had been a homicide on his beat. Sergeant White told Mr. Rios that he thought the victim was Mr. Valencia. Mr. Rios said that he knew Mr. Valencia because he had arrested him. Sergeant White told Mr. Rios to go to the scene to identify Mr. Valencia. Sergeant Kenneth Smith drove Mr. Rios, still in civilian clothing, to the crime scene to meet with Detective Tim Giger. When he arrived at the crime scene, Mr. Rios identified Mr. Valencia by looking at a picture.

Mr. Rios then returned to the police station to change into his uniform. He then returned to the crime scene, where he spent the majority of his shift.

On the evening of June 6, 2004, the Columbia Police Department received a Crime Stoppers report that a married police officer was having an affair with Mr. Valencia, the murder victim. On June 8, about 8:35 A.M., after learning of the Crime Stoppers report, Mr. Rios went to the office of Sergeant Stephen Monticelli, who was the supervisor of the investigation of Mr. Valencia's murder. Mr. Rios told Sergeant Monticelli that he had heard about the report suggesting that Mr. Valencia was having a sexual affair with a married police officer. Mr. Rios told Sergeant Monticelli that he was not having a sexual affair with Mr. Valencia but believed the report was talking about him. Sergeant Monticelli then told Mr. Rios that he needed to be officially questioned by the investigators. Mr. Rios agreed and, shortly thereafter, Sergeant Monticelli returned with Detective John Short to conduct the interview. At first, Mr. Rios denied having an affair with Mr. Valencia. However, after being confronted with information that a female witness had told them that Mr. Rios had visited Mr. Valencia's apartment in plain clothes, Mr. Rios began to change his story. As Detective Short continued to confront Mr. Rios with additional information that they had already gathered, Mr. Rios finally admitted that he had been to Mr. Valencia's apartment about five or six times and that he had engaged in sexual activity with Mr. Valencia. Mr.

Rios was eventually released and allowed to go home.

DNA comparison samples were ultimately sent to the crime lab for several individuals who may have had contact with Mr. Valencia, including Mr. Rios. Trace evidence found on Mr. Valencia's body, including hair, was also tested. The DNA in three of the hairs was found to be a 1 in 756.6 trillion match to Mr. Rios's DNA.[3] Fingernail clippings from Mr. Valencia were also sent to the crime lab. DNA under the fingernail clippings was found to be from three individuals, Mr. Rios, Mr. McDevitt, and Mr. Valencia. Mr. McDevitt's DNA was also found on Mr. Valencia's shorts, a condom from Mr. Valencia's apartment, a penile swab of Mr. Valencia, and from the sexual assault kit.

On September 1, 2004, the State filed a two count information against Mr. Rios for first degree murder and armed criminal action. At trial, the State's theory of how Mr. Valencia was killed was that Mr. Rios rendered Mr. Valencia unconscious by using a defensive technique called the "unilateral vascular neck restraint," which is taught to law enforcement personnel. Then, when Mr. Valencia was unconscious and lying down, the State argued that Mr. Rios slit his throat with a serrated knife. In addition, the State argued that Mr. Rios's motive in killing Mr. Valencia was to "close the mouth of Jesse Valencia forever" because Mr. Valencia had indicated to Ms. Sheridan that he was going to confront Mr. Rios about being a married man and that, if Mr. Rios did not make his ticket go away, he would reveal a "little

---

**3.** Mr. Rios presented evidence that the officer's written report indicated that only one hair was collected as evidence and failed to note that as many as six to ten hairs were actually collected from Mr. Valencia's body, placed in an evidence box, and sealed by the officer. In addition, Criminalist William Randle, who tested the trace evidence submitted by the Columbia Police Department in the box the officer had sealed, testified that after he slit the tape on both sides of the box with a razor blade, he noticed that one of the flaps on the side of the box was pushed all the way to the bottom indicating that the box had been opened.

secret" to the Columbia Police Department.

Following a week long trial, the jury found Mr. Rios guilty on both counts. Mr. Rios was sentenced to life imprisonment without parole on the murder count and a consecutive ten-year sentence for armed criminal action. This appeal followed.

## II. Prejudicial Error in Admission of Hearsay Statements

In his first point on appeal, Mr. Rios asserts that the trial court abused its discretion in overruling his objection to the admission of two hearsay statements of the victim. In particular, the first hearsay statement challenged by Mr. Rios concerns a statement made by the victim to Ms. Sheridan that he was going to end his relationship with Mr. Rios if he found out that Mr. Rios was married. The second challenged hearsay statement made by the victim, also to Ms. Sheridan, was that if Mr. Rios did not take care of a municipal ticket that Mr. Rios had issued to him, he had a secret that might be of interest to the Columbia Police Department, Mr. Rios's employer. Mr. Rios argues that neither statement falls within any hearsay exception and that the statements were improperly used by the State as proof of Mr. Rios's motive and evidence of his guilt.

The trial court has broad discretion in determining whether to admit or exclude testimony. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). This court will reverse the "trial court's ruling on the admission of evidence only if the court has clearly abused its discretion." *Id.* The trial court abuses its discretion " 'when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' " *Id.* (citation omitted). Moreover, this court reviews " 'for prejudice, not mere error, and will reverse only if the error

was so prejudicial that it deprived the defendant of a fair trial.' " *Id.* at 223–24 (citation omitted). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id.* at 224.

Prior to trial, Mr. Rios filed a motion in limine regarding the challenged hearsay statements. Mr. Rios alleged that the State should be precluded from eliciting statements made by Mr. Valencia concerning any "future plan to ask [Mr. Rios] about whether or not he was married, [and] about informing the police department about their 'affair.' " The trial court took the motion with the case.

At trial, the State asked Ms. Sheridan about the last conversation she had with Mr. Valencia prior to his death. Ms. Sheridan began to relate Mr. Valencia's statement, made on June 2, when Mr. Rios objected based on his previously filed hearsay objection. The trial court overruled the objection on the assumption "that the testimony [was] going to be about something that occurred in the future as opposed to the past." Ms. Sheridan then stated:

> [Mr. Valencia] just said, "The police officer might come over tonight." And I thought, Well, I probably didn't want to be there then. So I said, "If you want, I can just go home. And it's fine. I'll just see you tomorrow." And [Mr. Valencia] was like, "No. No. Just come over and spend the night. I just won't answer the door when he knocks. And just, you know—I'll just stay asleep." And then [Mr. Valencia] kind of paused for a second and he said, "I'm really going to ask him this time if he's married or not. Because if he's married, I don't want to be involved in a relationship with a married man."

The State then asked Ms. Sheridan about another conversation she had with Mr. Valencia regarding his ticket. Again, Mr. Rios objected on the basis of his previously filed motion in limine. The trial court overruled the objection on the assumption that Ms. Sheridan was going to "testify as to statements made as to future plans with respect to this issue." Ms. Sheridan then testified about the conversation she had with Mr. Valencia sometime around May 20th regarding his future plans in regard to the ticket:

> Well, he found out that his ticket still was in standing and that the charges were—sounded worse. And so he was really upset. And he—he said that he thought he wouldn't have had this ticket at this point and that would be gone. And then he said, "If he doesn't get this ticket taken away," the police officer didn't get the ticket taken away, he was going to—or he said he had a little secret that he thought the Columbia Police Department might like to know.

In his motion for new trial, and on appeal, Mr. Rios contends that the trial court abused its discretion in overruling his objections to the admission of Ms. Sheridan's testimony on the grounds that the statements were hearsay and not admissible under the state of mind exception because they were irrelevant to any issue in the case. Mr. Rios also claims that the statements were prejudicial because it would be impossible for the jury to use the statements as evidence of Mr. Valencia's state of mind concerning his future intentions but, rather, the jury would use the statements as proof of Mr. Rios's motive.

■ The State concedes that Mr. Valencia's statements to Ms. Sheridan were hearsay. Mr. Rios acknowledges that hearsay statements of a victim's state of mind made out of court can be admissible under the state of mind exception to the hearsay rule. *State v. Nastasio*, 957 S.W.2d 454, 458 (Mo.App. W.D.1997). *See also State v. Kennedy*, 842 S.W.2d 937, 942 (Mo.App. S.D.1992) ("general rule [is] that statements of a victim's present mental condition made out of court are excepted from the rule against hearsay"). To be admissible, however, such statements must be relevant. *State v. Ford*, 639 S.W.2d 573, 574 (Mo.1982). Nevertheless, Mr. Rios argues that the statements made by Mr. Valencia were not relevant to any issue in the case and, therefore, were inadmissible under the state of mind exception.

■ The "state of mind exception only permits admission of [ ] statements 'in limited situations when they are relevant and the relevancy outweighs their prejudicial effect.' " *Nastasio*, 957 S.W.2d at 458 (quoting *State v. Bell*, 950 S.W.2d 482, 483 (Mo. banc 1997)). In particular, the state of mind exception " 'is generally limited to cases where hearsay declarations of mental condition are especially relevant-particularly where the defendant has put the decedent's mental state at issue by claiming accident, self-defense or suicide.' " *Id.* (quoting *Bell*, 950 S.W.2d at 483). *See also Ford*, 639 S.W.2d at 575 (deceased's statements regarding state of mind admissible because "relevant to the issue of which participant in the shooting was the aggressor"); *State v. Pagano*, 882 S.W.2d 326, 331 (Mo.App. S.D.1994) (deceased's statement regarding state of mind admissible because relevant to theory of self-defense); *Kennedy*, 842 S.W.2d at 944 (deceased's statement regarding state of mind admissible because relevant to rebut defendant's evidence that her husband died by suicide or accident); *State v. Singh*, 586 S.W.2d 410, 419 (Mo.App. S.D.1979) (deceased's statements regarding state of mind admissible because relevant to rebut defense of accidental death and self-defense).

■ Here, Mr. Rios denied any participation in Mr. Valencia's murder and denied that he was present when the murder took place. Mr. Rios did not raise the issue of self-defense, accident, or suicide. Therefore, Mr. Valencia's statements were not relevant to prove that Mr. Valencia's "death was intentional rather than accidental or suicide" and, therefore, were inadmissible under the state of mind exception. *Nastasio,* 957 S.W.2d at 459. This conclusion, however, does not end our inquiry.

■ The state of mind exception to the hearsay rule also allows the admission of statements "to show a future intent of the declarant to perform an act if the occurrence of that act is at issue." *United States v. Brown,* 490 F.2d 758, 762 (D.C.Cir.1973). Specifically, " '[a] declaration indicating a present intention to do a particular act in the *immediate future,* made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed.' " *State v. Newson,* 898 S.W.2d 710, 716 (Mo. App. W.D.1995) (quoting *Lewis v. Lowe & Campbell Athletic Goods Co.,* 247 S.W.2d 800, 804 (Mo.1952)) (emphasis added). *See also State v. Buckner,* 810 S.W.2d 354, 358 (Mo.App. W.D.1991) ("A declaration that indicates a present intention to do a particular act in the *immediate future,* relevant to a fact in issue, is admissible to prove that the act was in fact performed.") (emphasis added).

Here, there is no indication of bad faith or self-serving ambition in Mr. Valencia's statements to Ms. Sheridan that he intended to confront Mr. Rios about whether he was married and that if Mr. Rios did not make his ticket go away that he was going to the Columbia Police Department to inform them of a "secret." Nevertheless, while both statements do indicate an intention on Mr. Valencia's part to perform a particular act, the statements do not indi-cate that Mr. Valencia intended to perform the acts in the *immediate future.* "Immediate" is defined as "acting or being without the intervention of another object, cause, or agency," or "near to or related to the present." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 578 (10th ed.2000).

That the statement be made in "immediate" proximity to the time the declarant intends to perform the act in order for the statement to be admissible under the future act exception is illustrated by this court's decision in *Newson.* In that case, Andrea Jones lived with Terry Newson for approximately one year. *Newson,* 898 S.W.2d at 712. One evening while Ms. Jones was talking on the telephone to Jacqueline Brooks, Mr. Newson came home. *Id.* Prior to that evening, Ms. Jones had confided in Ms. Brooks that on several occasions she had asked Mr. Newson to leave the house, but that he had not done so. *Id.* Upon Mr. Newson's return home, Ms. Jones told Ms. Brooks that she was getting off the telephone to tell Mr. Newson to leave one more time. *Id.* Ms. Brooks never heard from Ms. Jones again. *Id.* Four days later, also after failing to reach Ms. Jones, Doris Houston, Ms. Jones's mother, went to Ms. Jones's house. *Id.* Ms. Houston eventually discovered her daughter's dead body in her bed. *Id.* at 713. This court held that Ms. Jones's statement that she was getting off the telephone to tell Mr. Newson to leave was admissible as a statement " 'indicating a present intention to do a particular act in the *immediate future.*' " *Id.* at 716 (emphasis added). In other words, the statement was admissible because Ms. Jones's statement indicated that immediately, upon hanging up the telephone with Ms. Brooks, she was going to tell Mr. Newson to leave.

Similarly, this court's decision in *Lewis* also illustrates the requirement that to be

admissible the statement must be of an intention to do an act in the immediate future.[4] In that case, Russell Lewis was killed in an automobile accident between 3:30 and 4:00 A.M. on October 2, 1949. *Lewis*, 247 S.W.2d at 801. The Industrial Commission of Missouri, Division of Workmen's Compensation, ruled in favor of Mr. Lewis's widow and against Mr. Lewis's employer and found that he was " 'on a trip for his employer' and that the accident arose out of and in the course of his employment." *Id.* On appeal, the question was whether a statement made by Mr. Lewis to his wife on the evening before he left on his trip regarding the purpose of the trip was admissible. *Id.* at 803. Specifically, on the evening before Mr. Lewis left on his trip, he told his wife that "he would have to leave early the next morning; that it was necessary because they had some unfinished work down at Potosi that needed to be finished; [and] that they were meeting early to have a hunt at that same time[.]" *Id.* Before retiring that evening, Mr. Lewis set his alarm clock for 3:00 A.M. and was ready to leave at 3:30 A.M. *Id.* He was in the fatal accident sometime between 3:30 and 4:00 A.M. *Id.* The Court held that Mr. Lewis's statements to his wife, indicating Mr. Lewis's intention to " 'do a particular act in the immediate furture [sic],' " were admissible. *Id.* at 804 (citation omitted). Moreover, the Court specifically found that Mr. Lewis's statements "were not so remote from the contemplated trip that we may say as a matter of law they had no probative value." *Id.* at 806.

■ Here, the statements made by Mr. Valencia did not indicate that Mr. Valenica intended to perform any acts in the immediate future. The first statement regarding Mr. Valencia's intention to confront Mr. Rios about whether he was married was made on June 2, three days prior to Mr. Valencia's murder. In addition, at the time Mr. Valencia made the statement, Mr. Valencia told Ms. Sheridan that while he thought that Mr. Rios would be coming over to his apartment that evening, Mr. Valencia would pretend that he was sleeping and not answer the door when Mr. Rios knocked. Thus, at the time Mr. Valencia made the statement, Mr. Valencia had no "immediate" intent of confronting Mr. Rios about his marital status but, rather, the opposite; Mr. Valencia's statement suggested that he would *not* see Mr. Rios in the immediate future.

■ Moreover, Mr. Valencia's statement, "I'm really going to ask him *this time* if he's married or not," suggests that Mr. Valencia had contemplated asking Mr. Rios this question on a prior occasion but had failed to do so. (Emphasis added.) Statements of intention to perform a future act in the immediate future are " 'relevant to show that the act was probably done as planned.' " *Lewis*, 247 S.W.2d at 804 (citation omitted). Because Mr. Valencia's statement suggested that he contemplated taking such an act on a previous occasion but did not actually follow through with his intention further demonstrates the danger of admitting hearsay statements that are too remote in time. The more remote in time a stated action is intended to be taken, the longer the time period that exists for the person to change their mind and not actually follow through with their stated intention. *See* Douglas D. McFarland, *Dead Men Tell Tales: Thirty Times Three Years of the Judicial Process After Hillmon*, 30 VILL. L.REV. 1, 16, 22, 32, 57 (1985) (discussing dangers of

---

4. *See also Buckner*, 810 S.W.2d at 357–59 (finding admissible, under the future acts exception, statement made by murder victim

*forty-five minutes* prior to murder to demonstrate why victim returned home to meet the defendant for drug deal).

*Hillmon* doctrine and noting the "ever-present possibility" that a person's intention to do a future act is easily hindered or frustrated). Thus, statements that do not indicate an intention to act immediately inherently lack trustworthiness to show that that declarant actually followed through with their stated intention. Consequently, the trial court erred in admitting the statement Mr. Valencia allegedly made that he was going to ask Mr. Rios if he was married because it did not indicate an intent to do so in the immediate future and, therefore, does not fall within any recognized hearsay exception.[5]

■ Similarly, Mr. Valencia's second statement about confronting Mr. Rios about making his ticket go away or else he was going to go to the Columbia Police Department to inform them about a "secret" also lacks a present intention to perform a stated act in the immediate future. Mr. Valencia was arraigned on the charges on May 20th. Ms. Sheridan testified that Mr. Valencia made this statement sometime around May 20th, which was over two weeks prior to Mr. Valencia's murder. Moreover, Mr. Valencia's statement, "If he doesn't get this ticket taken away . . . he had a little secret that he thought the Columbia Police Department might like to know," does not expressly indicate that Mr. Valencia intended to actually *confront* Mr. Rios about the ticket. Rather, the only "act" Mr. Valencia's statement indicates that he intended

to take was to inform the Columbia Police Department about a "secret." In addition, Mr. Valencia's statement on June 2, after the statement regarding the ticket was made, suggested that Mr. Rios was planning on seeing Mr. Valencia that evening and Mr. Valencia no longer appeared concerned about the ticket. Thus, because Mr. Valencia's statement regarding the ticket did not indicate intent on Mr. Valencia's part to perform an immediate act in the future, it did not fall within the future acts exception and, therefore, it was inadmissible hearsay and the trial court clearly abused its discretion in admitting the statement.

■ The fact that the trial court erred in admitting both statements, however, does not necessarily mandate reversal. A conviction will be reversed for the erroneous admission of evidence "only if the error was so prejudicial that it deprived [Mr. Rios] of a fair trial." *Forrest*, 183 S.W.3d at 223–24. Here, the State offered Mr. Valencia's statements for the purpose of showing Mr. Valencia's intent to perform a future act, i.e., confront Mr. Rios about his marital status and his ticket. Based on this evidence, the State argued that the jury should draw the inference that Mr. Valencia did in fact carry out his stated intentions, did confront Mr. Rios about being married and getting his ticket fixed and, therefore, provided Mr. Rios with a motive to kill Mr. Valencia.

---

**5.** Moreover, while Mr. Valencia's statement did indicate that Mr. Valencia was going to ask Mr. Rios if he was married, the thrust of his statement went to Mr. Valencia's state of mind, i.e., "if he's married, *I* don't want to be involved in a relationship with a married man." (Emphasis added.) As discussed above, statements regarding a victim's state of mind are admissible only when the defendant has put the decedent's mental state at issue by claiming accident, self-defense, or suicide, which is not the case here. *Nastasio*, 957

S.W.2d at 458. Consequently, that portion of Mr. Valencia's statement regarding his desire not to be involved in a relationship with a married man is inadmissible hearsay that does not fall within any hearsay exception. And, by excluding the portion of Mr. Valencia's statement regarding his desire not to have a relationship with a married man, that portion of his statement indicating an intent to perform a future act, i.e., "I'm really going to ask him this time if he's married or not," has no context and is irrelevant.

Specifically, during closing statements, the State argued:

> Motive is important in this case. The motive was to close the mouth of Jesse Valencia forever. Look at the power Steven Rios gave Jesse Valencia when Steven Rios started having the affair with him. He gave Jesse Valencia the power over his police career, he gave Jesse Valencia the power over his marriage, he gave Jesse Valencia the power over his political aspirations. His whole life was turned over to Jesse Valencia's discretion. Whether Jesse Valencia was going to keep this secret or tell somebody.
>
> And look at what John—Joan Sheridan told you. This is the exact quote of what Jesse Valencia had said to her on June 2nd, just three days before his death, when he's talking about the confrontation he's planning on having the next time the police officer comes over. He said, quote, I'm really going to ask him this time if he's married, because if he's married, I don't want to be involved in a relationship with a married man, close quote.
>
> That's what happened. The night Steven Rios went by for his usual quickie, Jesse confronted him. And the first time that Jesse got in trouble when he confronted him is when he got arrested and got the handcuffs put on. This time when Jesse confronted him, Jesse was killed.
>
> The other thing was that Joan Sheridan told you about Jesse's thinking about how he's going to expose this secret affair if his ticket didn't go away. He had said, If the officer didn't get the ticket taken away, he had a little secret that he thought the Columbia Police Department might want to know. That's the exact quote from Joan Sheridan,

when he was—when she was on the stand.

> That Jesse was mad, because when he had gone to court on the 20th, not only did his ticket not go away, but, as Rose Wibbenmeyer explained, it had become a little worse, because now it was alleging force involved. So he was mad and he was going to confront the officer. And he did confront him. And look what happened.

Because the State utilized the erroneous admission of the statements to establish a motive for Mr. Valencia's murder, Mr. Rios was sufficiently prejudiced by the trial court's err in admitting the hearsay statements that he was deprived of a fair trial. *Forrest*, 183 S.W.3d at 223–24. Without the hearsay statements, there exists a reasonable possibility that the outcome of the trial would have been different. *Id.* at 224. Mr. Rios's first point is granted.

## III. Admission of State's Exhibits

In his second, third, and fourth points on appeal, Mr. Rios claims error in the admission of numerous State exhibits, including photographs of Mr. Valencia's body taken at the crime scene and during the autopsy (point two), a Spyderco clip knife purchased by the Columbia Police Department for trial (point three), and photographs of Mr. Valencia taken at a party on the morning that he was murdered (point four). Because this court is reversing the trial court's judgment on the basis of prejudicial error in the admission of Mr. Valencia's statements, the alleged errors argued by Mr. Rios in his additional points on appeal may be obviated by a new trial. To the extent the issues would recur in a new trial, they will be briefly addressed below.

### a. Crime Scene and Autopsy Photographs

In his second point on appeal, Mr. Rios claims that the trial court abused its discretion in admitting forty-seven gruesome photographs of the victim's body taken at the scene of the crime and during the autopsy. Mr. Rios contends that admission of the photographs, over his objection, was error because the photographs were irrelevant, duplicative, designed to inflame the passions of the jury, and the probative value of the photographs was outweighed by their prejudicial effect.

■■■■ "The trial court is vested with broad discretion in the admission of photographs." *State v. Rousan,* 961 S.W.2d 831, 844 (Mo. banc 1998). A relevant photograph "should not be excluded from evidence unless its prejudicial effect is greater than its probative value." *Id.* Mr. Rios first argues that all of the photographs were irrelevant because there was no dispute that the cause of death was an incised wound to the neck and none of the photographs assisted the jury in deciding the only contested issue, that being whether Mr. Rios murdered Mr. Valencia. Contrary to Mr. Rios's argument, however, even if the cause of death is known, "[p]hotographs are relevant if they show the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony." *Id.*

■■■■ Here, the challenged photographs can be divided into two categories, those taken at the scene of the crime and those taken at the medical examiner's office before and during the autopsy. The crime scene photographs consisted of State's Exhibits 16–17, 19–21, and 23–30. Each of these pictures depicted either Mr. Valen-

cia's body, including his wounds, or the blood soaked ground directly underneath where Mr. Valencia's body was initially discovered. On several of the photographs, flies are seen on Mr. Valencia's wounds. Each of these photographs demonstrated either the scene of the crime, the nature and extent of Mr. Valencia's wounds, or the condition and location of Mr. Valencia's body when it was discovered. Consequently, each of the crime scene photographs was relevant. *Id.*

■■■■ The photographs taken at the medical examiner's office consisted of State's Exhibits 31–34, 36–38, and 41–67. These exhibits were taken either before or during the autopsy. All of the exhibits were photographs of Mr. Valencia's wounds, with the exception of Exhibit 31, which was a photograph of the body bag with evidence tape across the zipper, and Exhibits 50–54, which were photographs of Mr. Valencia's hands, which were uninjured. Thus, each of these photographs, with the noted exceptions, demonstrated to the jury the nature and extent of Mr. Valencia's injuries. Therefore, the photographs were relevant. *Id.* Regarding Exhibit 31, the photograph of the body bag, the photograph was relevant to demonstrate the chain of evidence. Exhibits 50–54, the photographs of Mr. Valencia's uninjured hands, were relevant to prove the State's theory of the case, that being, that Mr. Valencia was rendered unconscious before his throat was slit based on the absence of defensive wounds to Mr. Valencia's hands. Thus, each of the photographs taken in the medical examiner's office was clearly relevant.

■■■■ Nevertheless, Mr. Rios argues that even if the photographs were relevant, that some of the photographs should not have been admitted for various reasons, including that they were duplicative,

cumulative, and "unnecessarily gruesome." " 'Photographs, although gruesome, may be admitted where they show the nature and location of the wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case.' " *State v. Davis,* 107 S.W.3d 410, 422 (Mo. App. W.D.2003) (citation omitted). Moreover, to the extent that "photographs tend to be shocking or gruesome, it is almost always because the crime is shocking or gruesome." *Rousan,* 961 S.W.2d at 844. This court has reviewed the entire forty-seven photographs challenged by Mr. Rios and, while the photographs are disturbing to view, the majority show either no injuries to parts of Mr. Valencia's body (e.g., Exhibits 50–54 are photographs of Mr. Valencia's hands, which contain no injuries), or show minor abrasions or bruising on various parts of Mr. Valencia's body (e.g., Exhibits 43–49, 55–67). The trial court did not abuse its discretion in admitting all of the photographs. On retrial, however, if the same objections are made, the trial court can revisit the question whether any of the photographs are unnecessarily duplicative or cumulative.

### b. Admission of Spyderco Clip Knife

■ In his third point on appeal, Mr. Rios asserts that the trial court abused its discretion in allowing the State to introduce, over objection, a Spyderco clip knife purchased by the Columbia Police Department for demonstrative purposes at trial. Mr. Rios claims that the admission of the knife was highly prejudicial because the knife had no connection to the crime or to him, it was irrelevant to any issue in the case, and the admission of the knife carried an undue risk of confusing the jury. Because the State is likely to attempt to offer the knife on retrial, the merits of this point will be addressed.

■ " 'The courts of this state, with notable consistency have recognized that weapons unconnected with either the accused or the offense for which he is standing trial lack any probative value and their admission into evidence is inherently prejudicial and constitutes reversible error.' " *State v. Grant,* 810 S.W.2d 591, 592 (Mo. App. S.D.1991) (citation omitted). Nevertheless, the Missouri Supreme Court has held that "[t]here is no absolute rule that demonstrative evidence of a weapon unconnected with the defendant or offense charged is inadmissible." *State v. Silvey,* 894 S.W.2d 662, 667 (Mo. banc 1995). Rather, demonstrative evidence, including a weapon, is admissible if it is relevant, is a fair representation of what it is offered to show, and there is no likelihood that the exhibit could deceive or mislead the jury. *Id.* at 667–68. Demonstrative evidence is relevant if it is "probative of a material issue in the case." *Id.* at 668. Moreover, "[t]he trial judge occupies a superior vantage point for balancing probative value and prejudicial effect of demonstrative evidence." *Id.* at 669. "Thus, the trial judge is necessarily vested with broad discretion in admitting or rejecting such evidence." *Id.*

In this case, the actual murder weapon was never located. Nevertheless, the State established, through the testimony of the medical examiner, that a knife had probably caused the fatal wound and, based on the particular pattern of the wound, there was "some degree of serration" in the knife. The State further established that Mr. Rios carried a "clip knife" with a serrated blade. Specifically, Officer Roger Schlude testified that before beginning his shift one day in January 2004, while sharpening his own knife in the briefing room, Mr. Rios asked Officer Schlude to borrow his sharpening stone to sharpen his knife. Officer Schlude noticed

that Mr. Rios's knife was a clip knife with a black handle and a serrated blade. Officer Schlude told Mr. Rios that his sharpening stone would not work on Mr. Rios's knife because the stone was not designed for a serrated blade. Based on the description of Mr. Rios's knife provided by Officer Schlude, investigators created a sketch of Mr. Rios's clip knife. The investigators purchased the Spyderco clip knife introduced into evidence based on the description of Mr. Rios's knife provided by Officer Schlude.

In addition, the State established through the testimony of several other witnesses that Mr. Rios carried a clip knife. For example, Officer Sean Moore, who worked with Mr. Rios, testified that he saw Mr. Rios carrying a clip knife both while in and out of uniform. Officer Moore testified that the Spyderco knife was consistent with the type of knife that he has seen Mr. Rios carry. Officers Harlon Hatton, Jason Baillargeon, and Justin LaForest also testified that they had seen Mr. Rios carrying a clip knife consistent with the Spyderco knife exhibit. Moreover, the medical examiner testified that the Spyderco knife was consistent with the instrument that had been used to cut Mr. Valencia's throat.

Finally, when the trial court overruled Mr. Rios's objection to admission of the Spyderco knife, the court instructed that the exhibit was "admitted for the sole purpose of a demonstrative exhibit" and that it was "in no way to be considered by this jury as anything to do with the murder weapon that might have been used in this case." Moreover, during closing argument, the State did not argue that the Spyderco knife was in any way connected to either Mr. Rios or the murder. Rather, the State argued that the actual knife used to kill Mr. Valencia was missing. Specifically, the State argued, "the murder weap-

on was successfully hidden by Steven Rios. It's somewhere in the river; somewhere in a storm sewer. We don't know where it is, because he got rid of it." Finally, defense counsel argued during closing statements that the State did not have a murder weapon but, rather, the State went and bought a "knife and put it into evidence" and the knife that they bought "[d]oesn't have any connection to this case." Moreover, defense counsel continued:

> It's a knife, a Spyderco knife, because that's the information they got. But it could just as well be some other kind of knife that you buy at Wal–Mart, that has serrated edges. Anybody could buy a knife like that. The state just went out and bought it and put it in evidence. That knife has—doesn't have anything to do with anything in this case.

Thus, given the trial court's instruction and the statements made by both the State and defense counsel during closing argument, the jury could not have been deceived or misled into believing that the specific Spyderco knife admitted in evidence had any connection to either Mr. Rios or the murder of Mr. Valencia.

In sum, the State presented evidence that Mr. Valencia's throat was slit with a knife that had a serrated edge. The serrated Spyderco clip knife purchased by the State in this case was proved to be consistent with a knife seen in Mr. Rios's possession by a number of different police officers. Because the murder weapon was never found, however, the Spyderco clip knife, which was representative of the type of knife that several witnesses testified they saw in Mr. Rios's possession, was relevant to establishing that Mr. Rios had access to a type of weapon that could have caused the fatal wound to Mr. Valencia. *See Silvey*, 894 S.W.2d at 669. In addition, given the trial court's instruction and argument made by

both the State and defense counsel, the jury could not have been misled into believing that the Spyderco clip knife admitted into evidence at trial was actually connected to either Mr. Rios or Mr. Valencia's murder. Thus, given the trial court's "superior vantage point for balancing probative value and prejudicial effect of demonstrative evidence," this court cannot say that the trial court abused its discretion in admitting the Spyderco clip knife. *Id.* Whether the knife is admissible on retrial will depend on whether the State meets the proper foundational requirements for admission of demonstrative evidence as set forth above.

### c. Admission of Photographs of Victim at Party

In his fourth point on appeal, Mr. Rios asserts that the trial court abused its discretion in allowing the State to introduce two photographs of the victim taken at a party on the morning he was murdered. On appeal, Mr. Rios claims that the photographs were irrelevant, were used to arouse the passions and sympathy of the jury, and any probative value the photographs may have had was overwhelmed by their prejudicial effect. In particular, Mr. Rios argues that the prosecutor used the photographs so that, in closing argument, the State could continually refer to Mr. Valencia as "this boy" because in the pictures, Mr. Valencia appeared younger than his actual age of twenty-three.

At trial, the State attempted to introduce three photographs (Exhibits 1, 2, and 3) taken by Ms. Witherspoon of Mr. Valencia at the party Mr. Valencia attended on the morning he was murdered. Exhibit 1 was a photograph of Mr. Valencia playing the drums and looking into the camera.

Exhibit 2 was a photograph of Mr. Valencia looking at the camera with a plastic glass in his hand.[6] Mr. Rios objected to the admission of all three photographs as being cumulative. In his motion for new trial, however, Mr. Rios argued that the admission of Exhibits 1 and 2 "were irrelevant to the facts of this case, cumulative, and prejudicial." On appeal, he argues that the photographs were "irrelevant to any issue to be decided in this case, were used to around [sic] the passions and sympathy of the jury, and any probative value the photographs may have had was overwhelmed by their prejudicial effect."

"[T]o preserve a point for appellate review, the point raised on appeal must be based upon the theory of the objection as made at the trial and as preserved in the motion for new trial." *State v. Cummings*, 134 S.W.3d 94, 108 n. 7 (Mo.App. S.D.2004). "Nothing is preserved for appellate review when the assignments of error in a motion for new trial and on appeal are enlargements of a general objection made at the time of trial." *Id.* Thus, review of Mr. Rios's claim is for plain error only. *State v. Phillips*, 939 S.W.2d 502, 505 (Mo.App. W.D.1997). Because this court reverses on other grounds, review of Mr. Rios's fourth point for plain error need not be considered since the issue is unlikely to arise in the same context on retrial.

The trial court's judgment is reversed and the cause is remanded for a new trial.

All concur.

---

**6.** The trial court sustained the objection to Exhibit 3, but overruled the objection regarding Exhibits 1 and 2 and, therefore, the two photographs were admitted into evidence.